JODY A. LANDRY, Bar No. 125743
LARA K. STRAUSS, Bar No. 222866
LITTLER MENDELSON
A Professional Corporation
501 W. Broadway, Suite 900
San Diego, CA 92101.3577
Telephone: 619.232.0441
Facsimile: 619.232.4302

Attorneys for Defendant
BEARINGPOINT, INC.

FILED
SEP 1 2 2006
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEORGE MURPHY,<br>Plaintiff,<br>v.<br>BEARINGPOINT, INC.,<br>Defendant. | Case No. '06CV 1842 B JMA<br>**NOTICE TO FEDERAL COURT OF REMOVAL OF CIVIL ACTION**<br>[28 U.S.C. §§ 1332(a)(1),(c)(1), 1441(a), 1446(a),(b)] |

TO THE CLERK OF THE ABOVE-ENTITLED COURT AND TO PLAINTIFF AND HIS ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that Defendant BEARINGPOINT, INC. ("Defendant" or "BearingPoint") hereby removes the above-referenced action of Plaintiff George Murphy ("Plaintiff"), filed in the Superior Court of the State of California, County of San Diego, to the United States District Court for the Southern District of California, pursuant to 28 U.S.C. sections 1441 and 1446. Defendant will promptly file in said Superior Court its Notice to State Court and All Adverse Parties of Removal of Civil Action. A true and correct copy of the Notice to State Court and All Adverse Parties of Removal of Civil Action, without its accompanying exhibits is attached hereto as Exhibit A. This case is being removed based upon diversity of citizenship. The grounds for removal are as follows:

///

///

## I.
## PROCEDURAL HISTORY

1. On August 15, 2006, an action was commenced against Defendant in the Superior Court of the State of California, County of San Diego, entitled *George Murphy v. Bearingpoint, Inc.*, San Diego Superior Court Case No. GIC 870905.

2. Defendant's agent for service of process, Corporation Service Company, was served with a copy of the Summons and a copy of the Complaint on August 15, 2006. A copy of the Notice of Service of Process from Corporation Service Company is attached hereto as Exhibit B. A copy of the Summons and the Complaint are attached hereto as Exhibits C and D, respectively. A copy of the Civil Case Cover Sheet filed by Plaintiff in San Diego Superior Court is attached hereto as Exhibit E. A copy of the Notice of Case Assignment issued by the San Diego Superior Court is attached hereto as Exhibit F. Exhibits C through F constitute all of the papers received by Defendant in the state court action.

3. Although Plaintiff's Complaint does not identify specific claims, based on the Complaint and the Civil Case Cover Sheet attached as Exhibit D, the Complaint appears to assert a single cause of action for breach of contract. Plaintiff's Complaint seeks the following relief: (1) payment of six month's salary totaling $162,500.00 plus interest, (2) payment of all attorney's fees and paralegal fees and (3) costs of suit. *See* Exhibit D, Prayer for Relief.

## II.
## TIMELINESS OF REMOVAL

4. Defendant timely filed its Answer to Plaintiff's Complaint ("Answer") on September 11, 2006. A copy of the Answer is attached hereto as Exhibit G.

5. This Notice to Federal Court of Removal of Civil Action is timely in that it is filed within thirty days after Defendant was served with the Summons and Complaint. 28 U.S.C. § 1446(b); *see also Murphy Brothers, Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344 (1999).

///

///

///

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
501 W. Broadway
Suite 900
San Diego, CA 92101.3577
619.232.0441

## III.
## BASIS FOR REMOVAL

6. This action is a civil action which this Court has original jurisdiction over under 28 U.S.C. sections 1332(a)(1) and (c)(1) and is one which may be removed to this Court by Defendant pursuant to the provisions of 28 U.S.C. sections 1441 (a) and 1446(b).

### A. Diversity of Citizenship

7. Defendant is informed and believes that Plaintiff was, at the time of commencing this action, and still is, a citizen of the State of California. *See generally* Exhibit D.

8. Defendant is, and at the time of filing the Complaint and this Notice was, a corporation formed under the laws of the State of Delaware and having its principal place of business in the Commonwealth of Virginia. 28 U.S.C. §§1332(a)(1), (c)(1), 1441(b). For purposes of removal jurisdiction, Defendant is not a citizen of California by reason of either its state of incorporation or its principal place of business.

9. Complete diversity of citizenship exists because Plaintiff and Defendant are, therefore, citizens of different states under 28 U.S.C. §1332(a)(1).

### B. Amount in Controversy

10. The amount in controversy in this case exceeds the sum of seventy-five thousand dollars ($75,000) exclusive of interest and costs. Plaintiff has specifically pled monetary damages in his Complaint in the amount of $162,500.00, which in and of itself exceeds the $75,000 minimum jurisdictional threshold of this Court. *See* Exhibit D, ¶ 9 and Prayer for Relief.

## IV.
## VENUE, BOND AND NOTICE

11. Venue is proper in this Court in that this is the Court of the District embracing the place where the action is pending in state court. 28 U.S.C. § 1441(a).

12. No bond is required for removal. 28 U.S.C. § 1446(d); *see also Rezendes v. Dow Corning Corp.*, 717 F. Supp. 1435, 1438 n.2 (E.D. Cal. 1989).

13. Contemporaneously with the filing of this Notice To Federal Court Of Removal Of Civil Action, a true and correct copy of this notice will be filed with the Clerk of the

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
501 W. Broadway
Suite 900
San Diego, CA 92101.3577
619.232.0441

Superior Court for the State of California, County of San Diego and notice of the removal will be provided to counsel for Plaintiff in accordance with 28 U.S.C. section 1446(d).

Wherefore, Defendant BEARINGPOINT, INC. hereby removes the civil action against it in the Superior Court of the State of California, County of San Diego, to the United States District Court, Southern District of California.

Dated: September 12, 2006

Lara K S

JODY A. LANDRY
LARA K. STRAUSS
LITTLER MENDELSON
A Professional Corporation
Attorneys for Defendant
BEARINGPOINT, INC.

LITTLER MENDELSON
A Professional Corporation
501 W. Broadway
Suite 900
San Diego, CA 92101.3577
619.232.0441

X010005

EXHIBIT A

# EXHIBIT "A"

JODY A. LANDRY, Bar No. 125743
LARA K. STRAUSS, Bar No. 222866
LITTLER MENDELSON
A Professional Corporation
501 W. Broadway, Suite 900
San Diego, CA 92101.3577
Telephone: 619.232.0441
Facsimile: 619.232.4302

Attorneys for Defendant
BEARINGPOINT, INC.

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN DIEGO

| | |
|---|---|
| GEORGE MURPHY,<br>Plaintiff,<br>v.<br>BEARINGPOINT, INC.,<br>Defendant. | Case No. GIC 870905<br>Assigned for all purposes to the Honorable Kevin A. Enright, Dept. 72<br>**NOTICE TO STATE COURT AND ALL ADVERSE PARTIES OF REMOVAL OF CIVIL ACTION TO THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA**<br>Complaint Filed: August 15, 2006<br>Trial Date: None Set |

TO THE CLERK OF THE ABOVE ENTITLED COURT, AND TO PLAINTIFF AND HIS ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. sections 1441 and 1446, on September 12, 2006, Defendant BEARINGPOINT, INC. ("Defendant") filed a Notice to Federal Court of Removal of Civil Action with the United States District Court for the Southern District of California for the purpose of removing the above-captioned case from the Superior Court of the State of California for the County of San Diego to the United States District Court for the Southern District of California. Copies of said notice and its accompanying exhibits are attached hereto as Exhibit 1.

////

////

PLEASE TAKE FURTHER NOTICE that the filing of said notice in Federal Court, together with the filing of a copy of said notice with this Court, effects the removal of this action in accordance with 28 U.S.C. section 1446(d) and the Court need take no further action with respect to this case unless and until the case is remanded.

Dated: September 12, 2006

JODY A. LANDRY
LARA K. STRAUSS
LITTLER MENDELSON
A Professional Corporation
Attorneys for Defendant
BEARINGPOINT, INC.

# EXHIBIT "B"

CORPORATION SERVICE COMPANY

KZS / ALL
Transmittal Number: 4711077
Date Processed: 08/20/2006

# Notice of Service of Process

**Primary Contact:** Michelle Nguyen
BearingPoint, Inc.
1676 International Drive
McLean, VA 22102

**Copy of transmittal only sent to:** Mr. Blake Guy

| | |
|---|---|
| **Entity:** | BearingPoint, Inc.<br>Entity ID Number 2191763 |
| **Entity Served:** | Bearingpoint, Inc. |
| **Title of Action:** | George Murphy vs. Bearingpoint, Inc. |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Labor / Employment |
| **Court:** | San Diego County Superior Court, California |
| **Case Number:** | GIC 870905 |
| **Jurisdiction Served:** | California |
| **Date Served on CSC:** | 08/18/2006 |
| **Answer or Appearance Due:** | 30 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| **Plaintiff's Attorney:** | Stephen B. Morris<br>619-239-1300 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

2711 Centerville Road Wilmington, DE 19808 (888) 690-2882 | sop@cscinfo.com

X010012

EXHIBIT C

# EXHIBIT "C"

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**NOTICE TO DEFENDANT:**
~~(AVISO AL DEMANDADO):~~
Bearingpoint, Inc.

COPY

**YOU ARE BEING SUED BY PLAINTIFF:**
***(LO ESTA DEMANDANDO EL DEMANDANTE):***
George Murphy

**You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.**

**There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.**

***Tiene 30 DIAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.***

***Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.***

The name and address of the court is:
*(El nombre y dirección de la corte es):*
San Diego Superior Court
Hall of Justice
330 W. Broadway San Diego, CA 92101

CASE NUMBER: *(Número del Caso):* GIC 870905

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Stephen B. Morris
Morris and Associates
401 West A St., Ste 2200
San Diego, CA 92101
(619) 239-1300

DATE: *(Fecha)* AUG 15 2006 Clerk, by *(Secretario)* L. Mansur, Deputy *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:
3. ☑ on behalf of *(specify)*: Bearingpoint Inc
under: ☑ CCP 416.10 (corporation) ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
☐ other *(specify)*:
4. ☑ by personal delivery on *(date)*:



Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]
Martin Dean's Essential Forms TM

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465

Murphy

**EXHIBIT "D"**

**Stephen B. Morris (SBN 126192)**
**MORRIS and ASSOCIATES**
**401 West "A" Street, Suite 2200**
**San Diego, California 92101**
**(619) 239-1300**

**Attorneys for Plaintiffs**

COPY

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF SAN DIEGO, CENTRAL JUDICIAL DISTRICT**

| | |
|---|---|
| **GEORGE MURPHY,** Plaintiff, v. **BEARINGPOINT, INC.** Defendants. | CASE NO. GIC 870905 **COMPLAINT** |

Comes now Plaintiff, GEORGE MURPHY, an individual, who alleges as follows:

1. Plaintiff George Murphy (Murphy) is an individual and a former Managing Director of defendant Bearingpoint, Inc., as well as being a former Managing Director and co-founding director of Bearingpoint, Inc.'s predecessors in interest, KPMG LLP and KPMG Consulting, LLC.

2. Bearingpoint, Inc. is a corporation organized and existing under the laws of the United States with its principal place of business in Washington, DC.

3. Jurisdiction and venue are proper in this Court because the subject contract was to be performed in this County and this judicial district and because the amount in controversy exceeds the jurisdictional minimums of this Court.

4. The subject agreement contains an arbitration clause by which the parties agreed to resolve

disputes arising under the agreement through binding arbitration. Plaintiff demanded arbitration from Defendants in writing, but was completely ignored. Repeated written demands were all ignored and the Defendants refused to cooperate in the arbitration process. Defendants have thereby waived their rights to arbitration, and the Plaintiff now waives his right to arbitration, seeking judicial determination of the dispute through this action instead.

5. In or about July 1999, Plaintiff became a partner of KPMG, LLP. In or about February 2000, KPMG, LLP which provided financial consulting and accounting services split into KPMG Consulting, LLC and KPMG LLP. This was done to avoid potential conflicts of interest between the company and its clients. Plaintiff became a Managing Director of KPMG Consulting, LLC.

6. As a Managing Director of KPMG, LLP and, subsequently, KPMG Consulting, LLC, Plaintiff was provided with certain benefits as set forth in various Managing Director Agreements and memoranda, including but not limited to the "Managing Director Agreement," attached hereto as Exhibit "A," the "KPMG Consulting Memorandum" dated May 16, 2000, attached hereto as exhibit "B," and the "Member Distribution Agreement," attached hereto as exhibit "C."

7. On or about January 14, 2005, after there had been yet another name change to Bearing Point, Plaintiff was notified that he was to be terminated pursuant to a reduction in force. Plaintiff was in fact terminated effective July 14,2005.

8. Although Plaintiff, a founding Managing Director, had been provided with assurances, both written and oral, that he would receive six months salary should he be terminated, except for cause, Plaintiff was not provided with this benefit, in breach of his employment agreement as set forth herein. Plaintiff at all times relied upon the representations made to him that he would receive six months severance pay should he be terminated except for cause. At the time Plaintiff was terminated his annual salary was $325,000.

9. As a direct result of respondent's breach, Plaintiff has incurred damages in excess of $162,500.00.

Wherefore, Plaintiff prays for judgment against Defendants, and each of them, as follows:

1. Payment by Bearingpoint, Inc of six month's salary totaling $162,500.00, plus interest thereon.

2. Payment of all attorney's fees and paralegal fees;

3. Costs of suit;

4. And for such other and further relief as the Court deems proper.

Dated: August 14, 2006

MORRIS AND ASSOCIATES, APC

By: [signature]

STEPHEN B. MORRIS, Attorney for Plaintiff, GEORGE MURPHY

Member Distribution Agreement Supercedes

# ATTACHMENT A

## MANAGING DIRECTOR AGREEMENT

This Agreement ("Agreement") is between KPMG Consulting, LLC ("LLC"), KPMG Consulting, Inc. ("KCI" and together with LLC, "Consulting") and ________________ ("You" and all similar references) as of ________________ (the "Effective Date"):

1. Employment. You accept employment on the terms of this Agreement from the Effective Date until the end of your employment with Consulting in accordance with Section 6. By signing this Agreement, you agree to: (a) devote your professional time and effort to Consulting's business and to refrain from professional practice other than on account of or for the benefit of Consulting or any of its subsidiaries; (b) perform any and all work assigned to you by Consulting faithfully and to the best of your ability at such times and places as Consulting designates; (c) abide by all policies of Consulting, current and future, including the Equal Employment Opportunity policy attached as Exhibit A; (d) abide by the Confidentiality and Intellectual Property Agreement attached as Exhibit B; and (e) abide by and take all requested action to support the Independence Policy and the auditor independence rules attached as Exhibit C, for as long as they apply to Consulting. You also confirm that you are not currently bound by any agreement that could prohibit or restrict you from being employed by Consulting or any of its subsidiaries or from performing any of your duties under this Agreement

2. Compensation and Benefits. As of the Effective Date, Consulting will pay you a base salary, less required and authorized withholding and deductions, payable in installments in accordance with Consulting's normal payroll practices. From time to time, Consulting may adjust your salary and other compensation in its discretion. During your employment, you will be eligible to participate in any employee compensation or benefit plans (including group medical and 401(k)), incentive award programs, and stock option plans (and, in the event of an initial public offering of Consulting common stock ("IPO"), any applicable employee stock purchase plan that Consulting may adopt) and to receive other fringe benefits that Consulting may decide to make generally available to employees in your position. Consulting may amend or discontinue any of its plans, programs, policies and procedures at any time for any or no reason with or without notice.

You agree that in order to receive any stock options, you will be required to enter into a separate stock option agreement which will provide (among other things) for the termination of your stock options and a payment to Consulting of some or all of your gain if you violate Sections 1(d), Exhibit B, 3, or 6(b).

3. Covenants. In consideration of your employment and eligibility for stock options, you agree to the following obligations which are reasonably designed to protect Consulting's legitimate business interests without unreasonably restricting your ability to earn a living after leaving Consulting. The wishes or preferences of a Client or Prospective Client (defined below) are not relevant to or admissible in any dispute under Sections 3 or 4:

(a) While employed with Consulting and until the later of February 1, 2003* or 1 year after your termination or resignation, you cannot enter a relationship or venture to provide Consulting Services for the benefit of an entity other than Consulting. A relationship is defined as an association with (i) another management group member of Consulting (or other comparable individual), or (ii) any individual who was a management group member of Consulting (or other comparable individual) within 12 months before your termination or resignation or 12 months before you seek to perform Consulting Services with such an individual, whichever is later.

(b) If your employment with Consulting terminates and you do not perform any Consulting Services whatsoever for a one year period after your termination or resignation, you may request to be released from Section 3(a) by submitting written certification of the nonperformance to Consulting's General Counsel. Consulting will release you from Section 3(a) if such certification is sufficient.

(c) While employed with Consulting and for 2 years after your termination or resignation, you shall not, directly or through anyone else: (i) perform, provide or assist any entity in performing or providing Consulting Services for any Client or Prospective Client; or (ii) solicit or assist any entity in soliciting any Client or Prospective Client for the purpose of performing or providing any Consulting Services.

(d) While employed with Consulting and for 2 years after your termination or resignation, you shall not, directly or indirectly solicit, employ or retainany employee of Consulting or any former employee who left Consulting within 12 months before or after your termination or resignation to perform Consulting Services with you or any person associated with you.

4. **Remedies.** In addition to any other remedies that may be available to Consulting for breach of this Agreement, you agree to the following obligations and accept the following consequences for breaching Section 3. You agree that Consulting will suffer damages as a result of your breach of Section 3 that are difficult to calculate and that the payments required by Section 4 are a reasonable forecast of the damages likely to result and are not a penalty of any kind. In particular, you agree that your total compensation is based on your value to Consulting, and that it reflects your efforts at developing and maintaining client and employee on behalf of Consulting.

(a) If you breach Section 3(a) on or before February 1, 2003, you will pay KCI or its designee an amount equal to 100% of the total annual compensation (including salary and bonus) paid or payable to you by Consulting over the past year. These payments will be made in not less than quarterly cash installments over the 24 months following your breach.

(b) If you breach Section 3(c)(i) or (ii), you will, in addition to any payments under Sections 4(a) or 4(c), pay KCI or its designee 50% of the gross fees and other amounts paid or payable during the 3 years after the breach to you or any other entity associated with you, by any Client or Prospective Client that was solicited or provided with services in violation of Section 3(c)(i) or (ii). These payments will be made in cash within thirty days after payment by the Client or Prospective Client.

(c) If you breach Section 3(d), you will, in addition to any payments under Sections 4(a) or 4(b), pay KCI or its designee 100% of the total compensation (including salary and bonus) paid or payable by Consulting to the solicited, employed or retained employee during: (i) the 12 months before your breach of Section 3(d); or (ii) in the case of a former employee, the 12 months before the employee left Consulting. These payments will be made in not less than quarterly cash installments over the 24 months following such breach.

5. **Certain Definitions.**

**"Cause"** means any of the following conduct by you: (I) embezzlement, misappropriation of corporate funds, or other material acts of dishonesty; (II) commission or conviction of any felony, or of any misdemeanor involving moral turpitude, or entry of a plea of guilty or nolo contendere to any felony or misdemeanor; (III) engagement in any activity that you know or should know could harm the business or reputation of Consulting or any of its subsidiaries; (IV) material failure to adhere to Consulting's corporate codes, policies or procedures; (V) continued failure to meet performance standards as determined by Consulting over two consecutive performance review periods; (VI) a breach or threatened breach of any provision of Sections 1(d), 3 or Exhibit B, or a material breach of any other provision of this Agreement if the breach is not cured to Consulting's satisfaction within a reasonable period after Consulting provides you with notice (to your address on Consulting's records) of the breach (no notice and cure period is required if the breach cannot be cured); or (VII) violation of any statutory, contractual, or common law duty or obligation to Consulting or any of its subsidiaries, including without limitation the duty of loyalty.

**"Client"** means any entity that is or was a client of Consulting (which includes any subsidiary of Consulting throughout this definition) at or within 12 months before the time you seek to solicit or perform services for such client and that, within 2 years before your termination or resignation, you: (I) performed Consulting Services for or on behalf of Consulting, or (II) had contact with, knowledge of, or access to Proprietary Information (as defined in Exhibit B) or other information concerning the client, in connection with your Consulting employment.

**"Consulting"** as used throughout this agreement includes any subsidiary of Consulting with which you become employed or associated.

**"Consulting Services"** means the management and information technology consulting services conducted and provided by Consulting (or any Consulting subsidiary with which you become employed or associated) during your employment.

**"Prospective Client"** means any entity that is not a Client but with respect to whom, within 1 year before your termination or resignation, you: (I) conducted, prepared or submitted, or assisted in conducting, preparing or submitting, any proposal or client development or marketing efforts on behalf of Consulting (which includes any subsidiary of Consulting throughout this definition) or (II) had contact with, knowledge of, or access to Proprietary Information or other information concerning the client, in connection with your Consulting employment.

6. **Termination and Resignation**. (a) Your employment is terminable at will. Consulting may terminate your employment for Cause effective immediately upon written notice (to your address on Consulting's records). You will

be entitled to earned and unpaid base salary and payment for any earned and unused personal days through the termination date (except in the case of performance deficiencies as provided below).

Consulting also may terminate your employment other than for Cause or for no reason, effective upon written notice (to your address on Consulting's records) or any later date specified in the notice. In this case, or if Consulting terminates your employment due to deficient performance by you, you will be entitled to all earned and unpaid base salary through the termination date. Consulting will also pay you for any earned and unused personal days and an additional amount of severance pay which, when added to your personal days payment (if any), totals 6 months pay at your then current base salary. All of the payments in this Section 6(a) are less required and authorized withholding and deductions.

(b) You may voluntarily terminate your employment with Consulting upon 180 days prior written notice directed to Consulting's Human Resources Department unless the Chief Executive Officer of Consulting ("CEO") waives this notice in writing. Without limiting any other remedies, if you breach this Section 6(b), before the later of (i) August 1, 2001 or (ii) 12 months after an IPO, you will pay KCI or its designee 50% of the total compensation (including salary and bonus) paid or payable to you on an annualized basis by Consulting during the fiscal year in which your breach occurs. These payments will be made in quarterly cash installments over the 24 months following your breach.

(c) You agree to provide all assistance requested by Consulting in transitioning your duties, responsibilities and client and other Consulting relationships to other Consulting personnel, both during your employment and after your termination or resignation.

7. **Arbitration**. All disputes between you and Consulting (which includes any subsidiary of Consulting throughout this Section 7) shall be resolved by arbitration in New York or Virginia at the election of Consulting. Arbitrable disputes include without limitation employment and employment termination claims and claims by you for employment discrimination, harassment, retaliation, wrongful termination, or violations under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans With Disabilities Act, the Family and Medical Leave Act, or the Employee Retirement Income Security Act, under any other federal, state, foreign or local law, regulation, ordinance, executive order, constitution, or under common law.

Arbitrations shall take place before a panel of three arbitrators which shall consist of one person selected by each of the two sides to the dispute and the third person jointly selected by the other two arbitrators. The arbitration panel shall have no authority to modify this Agreement (except pursuant to Section 12) or to award punitive or exemplary damages. Consulting may, without waiving its right to compel arbitration, and without securing or posting any bond, seek injunctive or other provisional relief from a court of competent jurisdiction in aid of arbitration, to prevent any arbitration award from being rendered ineffectual, to protect Consulting's confidential information or intellectual property or for any other purpose in the interests of Consulting. The courts of New York or Virginia or any court of competent jurisdiction in any other state will have jurisdiction over any proceeding relating to arbitrations, and may enter judgment on any arbitration award rendered or grant judicial recognition of the award or an order of enforcement. You agree to reimburse Consulting upon demand for any and all costs (including, without limitation, attorneys' fees and court costs) incurred by Consulting in enforcing any of its rights under this Agreement.

8. **Survival.** Sections 1(d), 1(e), 2 through 5, 7 through 14, and Exhibits B and C shall survive any termination of this Agreement or your employment (including your resignation). This Agreement shall continue despite any liquidation or dissolution of LLC.

9. **Entire Agreement.** This Agreement is the entire agreement between you and Consulting regarding these matters and supersedes any verbal and written agreements on such matters. In the event of a conflict between the main body of this Agreement and the Exhibits, the main body of the Agreement shall control. This Agreement may be modified only by written agreement signed by you and the CEO or their designee. All Section headings are for convenience only and do not modify or restrict any of this Agreement's terms.

10. **Choice of Law**. This Agreement shall be governed by New York state law. You and Consulting consent to the jurisdiction and venue of any state or federal court in the State of Virginia or the Borough of Manhattan, New York, New York and agree that any permitted lawsuit may be brought to such courts or other court of competent jurisdiction. Each party hereby waives, releases and agrees not to assert, and agrees to cause its affiliates to waive, release and not assert, any rights such party or its affiliates may have under any foreign law or regulation that would be inconsistent with the terms of this Agreement as governed by New York law.

11. **Waiver**. Any party's waiver of any other party's breach of any provision of this Agreement shall not waive any other right or any future breaches of the same or any other provision. The CEO may, in his or her sole discretion, waive any of the provisions of Sections 1(d), 3, 4 or 6.

12. **Severability**. If any provision of this Agreement is held invalid or unenforceable for any reason, the invalidity shall not nullify the validity of the remaining provisions of this Agreement. If any provision of this Agreement is determined by a court or arbitration panel to be overly broad in duration, geographical coverage or scope, or unenforceable for any other reason, such provision will be narrowed so that it will be enforced as much as permitted by law.

13. **Assignment and Beneficiaries**. This Agreement only benefits and is binding on the parties and their respective affiliates, successors and permitted assigns (to include KPMG LLP to the extent provided in this Agreement) provided that you may not assign your rights or duties under this Agreement without the express prior written consent with the other parties. KCI/LLC/KPMG LLP each may assign any rights or duties that it has, in whole or in part, to either of the other entities or their affiliates and subsidiaries without your consent.

14. **Counterparts**. For convenience of the parties, this Agreement may be executed in one or more counterparts, each of which shall be deemed an original for all purposes.

**The parties state that they have read, understood and agree to be bound by this Agreement and that they have had the opportunity to seek the advice of legal counsel before signing it and have either sought such counsel or have voluntarily decided not to do so:**

KPMG CONSULTING, INC. and LLC

By: ______________________

Title: ______________________

Dated: ______________________

EMPLOYEE

______________________
(Signature)

______________________
(Print Employee's Full Name)

______________________
(Employee's ID)

Dated: ______________________

**DATE:** May 16, 2000

**TO:** KPMG Consulting Managing Directors

**FROM:** Rand Blazer

**SUBJECT:** Managing Director Compensation Program & Employment Policy

Attached is our Managing Director Compensation Program & Employment Policy. We wanted you to have this so that you have a reference document on our compensation approach for MDs.

Clearly, our compensation program reinforces our strategy to have strong base income with the ability to earn even more with team and individual performance. In this way, a percentage of our total compensation is at risk and as such should provide an incentive to keep our business growing. The four key elements of our total compensation program, as described further in the attached document, are outlined below:

- Base Pay (guaranteed),
- Team Award (at risk with business performance),
- Individual Incentive Compensation (at risk with business and individual performance), and
- Stock Options (at risk, but worth more with long term business growth and awarded based on individual performance).

Also included in this document is a recap of our employment terms, conditions and benefits as they apply to Managing Directors. We believe that our MD program effectively compensates and rewards our MDs while protecting the interests and resources of our business.

X01925

**KPMG Consulting, Inc.**

# MANAGING DIRECTOR COMPENSATION PROGRAM & EMPLOYMENT POLICY

At KPMG Consulting, we are excited about the significant opportunities that are available to us and recognize that our Managing Directors (MDs) are a key factor in the full realization of those opportunities. We are committed to being the employer of choice for our MDs—a great place for long-term career opportunity, recognition and rewards. This document summarizes the compensation strategy, employment agreement arrangements, benefits and termination policy that we have developed to help us achieve this important objective.[1]

## I. MD COMPENSATION PROGRAM

### Our Managing Director Compensation Strategy

At KPMG Consulting, we look to our Managing Directors (MDs) to represent us in the marketplace, drive the growth and profitability of our business, and effectively develop and mentor our people. We hold each MD accountable to meet specific top and bottom line goals, as well as to build and lead strong and capable teams, from which new leaders will arise. Without these top-notch leaders, we will not succeed as a business. To meet our aggressive business objectives, we must continually evaluate how to best attract, retain and motivate these highly qualified and competent leaders. With that in mind, we have developed a MD compensation strategy which is designed to:

- Move toward a more competitive mix of variable and base pay, allowing more opportunity for significant upside for top performers through variable pay.
- Reward contribution for overall company performance through a MD Team Bonus Award,
- Reward contribution at the individual level through Individual Incentive Awards (for short term contributions) and Performance Option Grants (for future value).
- Offer the right mix of short term and long term incentives to keep our leaders motivated to make decisions that balance short term results with long term growth objectives.

Migrating to a compensation system with base pay, incentive compensation and long term equity as its primary components gives us the ability to offer our leaders a comprehensive compensation package. It also affords us the flexibility to tailor the mix of compensation based on individual responsibility and performance, the varying needs of the business, and the fiercely competitive market conditions we face as we seek to attract and retain the best talent.

### Base Pay

In February, 2000, KPMG Consulting transitioned from a partnership to a corporation. That transition necessitated fundamental changes in our approach to base compensation. In the past, each partner received a target base compensation at the beginning of the fiscal year. Depending on year-end unit value,

[1] Please note that this document is intended for general informational purposes only. It does not create any contractual rights of any kind (either express or implied) and, in particular, is not a contract for continued employment for any specified duration. While KPMG Consulting aspires to maintain consistency in its compensation structures, benefits and other employment terms and conditions, KPMG Consulting, like any employer, reserves the right to modify or discontinue such terms and conditions and any matters described in this document at its discretion, except to the extent otherwise provided in an MD's agreement with KPMG Consulting.

that compensation number was generally met and paid throughout the course of the year. Starting July 1, 2000, all former consulting partners (now consulting MDs), will transition to receive 80% of what they had formerly known as target compensation. This number will become their guaranteed base salary. For most, this means a portion of total compensation is shifted away from the base pay component, toward the variable elements such as the team award, incentive compensation and stock option awards. This reallocation of compensation provides all MDs with the opportunity to maintain and possibly exceed their former total compensation.

This reallocation does not preclude an MD from receiving an overall increase to base pay during the year-end review cycle in July, 2000. Depending on factors such as current base salary, performance and role, an MD may receive an increase to base pay, even after the reallocation. Going forward, each MD will be reviewed during the annual review cycle to ensure base pay is set at a fair and competitive amount to begin the new fiscal year.

**Team Award**

Also a result of the recent transition, the Team Award is designed to tie all MDs into the overall profit goals of the company. The Team Award will be funded by the 20% reallocation of former target compensation to variable pay. Under this award, each MD will receive up to 25% of base pay through a cash award determined by KPMG Consulting, payable at the end of the fiscal year, subject to KPMG Consulting meeting its profit goals. For example, an MD who received $500,000 in FY00 target compensation may be adjusted in July, 2000, to receive FY01 base pay of $400,000 (80%). That MD would be then eligible to receive up to $100,000 in the FY01 Team Award (25% of FY01 base pay). Also note, for MDs joining KPMG Consulting during the fiscal year, the Team Award payout will be pro-rated based on the number of days in the fiscal year in which the MD is employed by KPMG Consulting.

If KPMG Consulting only partially meets its profit goals, the funds from the Team Award will be used to the extent necessary to make up for the shortfall in the profit results. Once the shortfall is addressed, any excess funds remaining in the Team Award pool will be distributed proportionately to all eligible MDs in accordance with KPMG Consulting's payout criteria.

**Individual Incentive Compensation**

While base pay recognizes a Managing Director's long term progression relative to a series of roles and responsibilities, incentive compensation is a tool to reward truly superior achievement in any single year. Incentive compensation is used to directly reward outstanding performance in a given year relative to goals and peer group performance. It gets to the heart of an important and fundamental question: In what ways did an individual's performance drive the company's success?

Each year, we will accrue an incentive compensation pool that may be used in whole or part to reward those MDs who achieve extraordinary performance against their individual goals. Every MD will have the opportunity for an incentive award, and there will be no restriction on who receives it or how much they receive, with the exception of any specific limitations imposed by the Compensation Committee of the Board of Directors. The incentive compensation pool is budgeted at the beginning of the year. The pool is accrued during the year, based on the business performance. This later point is important. For the pool to exist, Consulting must achieve its planned net income numbers.

Going forward, it will be the responsibility of the members of the Executive Team to recommend—and for the Board of Directors to approve as it sees fit—the pool for incentive compensation and the individual award amounts.

**Long Term Incentives – Stock Options**

***Initial & New Hire Grants***

In January 2000, KPMG Consulting granted stock options to all existing Managing Directors who met basic eligibility requirements (active employees receiving a Met Some Expectations or higher performance rating). Each MD received an allocation of option shares in the new organization based on current role and responsibilities, historical performance and future value to the business. By granting this initial allocation of shares, we ensured that all of our leaders were invested in the future success of KPMG Consulting.

Subsequent to the initial grant, we instituted an ongoing "new hire" grant, in which we award stock options to all direct-hire MDs, as they join us.

***Managing Director Promotion Stock Option Grants***

Even though our structure has changed from a partnership to a corporation, we intend to preserve the advantages of our partnership culture. We still look to our Managing Directors to lead us in the marketplace, to build a strong practice team, to take responsibility for managing and mentoring the individuals on their team, and to successfully manage growth and profitability within their practice. We also still look to promote the Senior Managers who demonstrate the capabilities to become successful Managing Directors. In order to make the promotion to Managing Director a significant one, we have instituted a one-time promotion grant that creates substantial equity opportunity (options) for Senior Managers upon being promoted to Managing Director.

***Performance Grants***

In addition to the initial, new hire, and promotion grants for MDs, we will also begin awarding performance stock option grants on an annual basis, starting in July, 2000, to our top performers. With performance grants, we seek to significantly reward top performers who stay and participate in the long term success of our company.

To earn a performance grant, the same principles apply as in earning an individual bonus. Like the individual bonus, the performance grant is a discretionary grant designed to reward those individuals who achieve extraordinary performance, evidenced by meeting stretch goals that directly impact and significantly enhance revenue generation and/or practice profitability.

A difference between the individual bonus and the performance grant is, in part, timing. The individual bonus rewards extraordinary performance directly impacting the year's growth targets with a cash payment. A performance grant, on the other hand, rewards extraordinary performance in all performance categories, in the long term, creating an incentive for top performers to stay with KPMG Consulting and keep performing. Long term incentives, like the performance grant, keep the recipients invested in the success of the company while creating significant financial upside for the individual.

Performance grants will vary based on role and achievement level. We plan to grant performance options to up to 60% of our MDs.

## II. MD AGREEMENTS

All Managing Directors have signed (or will sign) agreements relating to employment. These agreements are designed to protect the interests of the business and prevent predatory or damaging behavior that could potentially disrupt the growth and profitability of our business. For Founding Managing Directors, their agreement is the Member Distribution Agreement (MDA), signed in January 2000. For the MDs who

were not eligible for founders, they have a combination of the Member Agreement (signed in January 2000) and a Managing Director Employment Agreement (to be signed in May 2000). For all other MDs, as well as new MDs, their agreement is the Managing Director Agreement (MD Agreement) which is a separate document (see Attachment A), signed upon hire or promotion to MD.

## III. MD BENEFITS / TERMINATION POLICY

In addition to the health and welfare benefits offered to all employees, Managing Directors are eligible to receive other benefits that KPMG Consulting may provide to MDs from time to time. They are also subject to a different termination policy than that applicable to the general staff population. These benefits and this termination policy are summarized in the sections below.

### Personal Days

All Managing Directors accrue 25 paid Personal Days (eight-hour days) per year, which accrue pro rata on a monthly basis, beginning in the first month of employment (on a calendar year basis). These Personal Days may be used as vacation or as sick days or for other personal reasons. Personal Days may be carried over each year, but in no event can an MD accrue more than 200 hours of Personal Days.

In no case will an MD be paid for unused Personal Days while still working for Consulting. If an MD leaves the firm, he or she receive payment for accrued, unused Personal Days earned up to the date of termination.

### Termination Policy

#### *Voluntary Termination*

If an MD resigns employment voluntarily, KPMG Consulting has the right, under the terms of the applicable Member Distribution Agreement, Member Agreement or MD Agreement, to require 180 days prior written notice. If sufficient notice is not given, KPMG Consulting may require a payment of up to 50% of annual compensation on the resigning MD. However, at the discretion of the CEO, the 180-day notice requirement may be waived. In the event that the notice is waived and an acceptable departure date is agreed to by KPMG Consulting, the departing MD will be paid for any earned, unpaid base salary for up until the last day of employment, as well as for any earned and unused personal days.

#### *Involuntary Termination/ Severance*

If an MD is involuntarily terminated without "Cause" (as defined in the MD's applicable agreement), he/she will be paid for any earned and unpaid base salary for up until the last day of employment. The MD also will be entitled to receive 50% of annual base pay, inclusive of the payment for any earned and unused personal days.

For example, an MD whose total annual base pay is $100,000 and who is entitled upon termination to $5,000 for earned and unused personal days, will receive $50,000 in total severance pay--$5,000 for the personal days plus an additional $45,000 to bring total severance up to 50% of annual base pay.

This Severance policy does not apply when:

- The MD terminates employment voluntarily.
- The MD becomes disabled or dies.

- The MD is terminated for any of the following reasons: breach of any part of the applicable Member Distribution Agreement, Member Agreement or MD Agreement, harmful or illegal acts, or failure to comply with Consulting's policies or any other conduct constituting "Cause" under the MD's applicable agreement.

*Note:* An MD who terminates employment, whether voluntarily or involuntarily, will not be entitled to receive any Individual Incentive Compensation Award, Team Award or stock option grant.

**Short Term Disability**

Beginning July 1, 2000, all MDs will be covered under the short term disabilitsy plan. After 5 consecutive days of illness or injury as defined in the short term disability (STD) plan, a Managing Director may begin collecting STD benefits of up to 66-2/3 percent of base pay. Benefits will be paid until recovery or until the end of the 25th week after the initial 5-consecutive-day period, whichever comes first. Benefits are offset by workers' compensation, statutory disability benefits, etc., so that total disability income from all sources will equal 66-2/3 percent of base pay.

The duration of STD benefits varies from case to case depending on the medical condition of the MD. In no case, however, will STD benefits exceed the plan's 25-week maximum. If an MD is still unable to resume work after 25 weeks, he/she may apply for LTD benefits or take personal days.

**Long Term Disability**

KPMG Consulting requires its MDs to carry Long Term Disability Insurance, sometimes called Salary Continuance Insurance. This program provides for a partial continuation of income in the event of total disability due to accidental injury or sickness.

Monthly Long Term Disability benefits are equal to two-thirds of base pay, with a maximum benefit of $30,000 per month. There are no offsets (e.g., Social Security benefits) under this policy.

All MDs will be covered automatically for Long Term Disability Insurance on the day on which they become an active MD with KPMG Consulting. Before monthly benefits are payable, a waiting period of 26 consecutive weeks of total disability is required. Long Term Disability benefits will cease at the time of recovery or at the end of the month in which age 60 is attained, whichever is earlier.

## IV. CONCLUSION

This year, we've built the framework for a cutting edge compensation program & fair employment policy for our leaders. We're excited at the new compensation tools we have available now through long term incentives. As we go forward, we will continue to build on our total compensation program, keeping in mind that our leaders are the real building blocks of our business. We will continue to invest in and build our business around the people that make it successful.

X019925

EXHIBIT C

X01003l

# MEMBER DISTRIBUTION AGREEMENT

By and Among

KPMG CONSULTING, LLC,

KPMG CONSULTING, INC.,

KPMG LLP

and

THE INDIVIDUAL LISTED ON
THE SIGNATURE PAGE HERETO

# TABLE OF CONTENTS

Page

ARTICLE I

DEFINITIONS AND INTERPRETATIONS . . . . . 2

Section 1.1. Definitions . . . . . 2
Section 1.2. Rules of Construction . . . . . 7

ARTICLE II

ACCREDITED INVESTOR REPRESENTATIONS . . . . . 9

Section 2.1. Investment Purpose . . . . . 9
Section 2.2. Financial Capacity . . . . . 9
Section 2.3. Knowledge . . . . . 9
Section 2.4. Information . . . . . 9
Section 2.5. Holding Period . . . . . 9
Section 2.6. Unregistered Securities . . . . . 10
Section 2.7. Due Authorization; No Conflicts . . . . . 10
Section 2.8. Accredited Investor Status. . . . . . 10
Section 2.9. Legend. . . . . . 10
Section 2.10. Disclosure of Information . . . . . 11

ARTICLE III

STOCK TRANSFER RESTRICTIONS . . . . . 11

Section 3.1. Transfer Restrictions. . . . . . 11
Section 3.2. Permitted Transfers. . . . . . 12
Section 3.3. Lock-Up Provisions. . . . . . 12
Section 3.4. General Transfer Restrictions. . . . . . 13
Section 3.5. Change of Control . . . . . 13
Section 3.6. Certain Transfers . . . . . 13

ARTICLE IV

THE EXCHANGE . . . . . 14

Section 4.1. Exchange . . . . . 14
Section 4.2. Exchange Terms . . . . . 14
Section 4.3. Delivery of Certificates. . . . . . 14
Section 4.4. Dividends and Distributions . . . . . 14

Section 4.5. LLC Agreement. . . . 14

ARTICLE V

DIVESTITURES RELATED TO AUDITOR INDEPENDENCE . . . . 14

Section 5.1. Independence Requirement . . . . 14
Section 5.2. Separation Prior to the Restricted Period End Date . . . . 15
Section 5.3. Separation After the Restricted Period End Date . . . . 15
Section 5.4. Auditor Independence Related Divestitures. . . . . 15
Section 5.5. Covenants . . . . 15

ARTICLE VI

AGREEMENT TO WITHDRAW . . . . 16

Section 6.1. Withdrawal. . . . . 16
Section 6.2. Consequences of Withdrawal . . . . 16
Section 6.3. Severance. . . . . 16
Section 6.4. Release . . . . 17
Section 6.5. Policies and Procedures . . . . 17

ARTICLE VII

POWER OF ATTORNEY . . . . 18

Section 7.1. Power of Attorney . . . . 18

ARTICLE VIII

ADDITIONAL AGREEMENTS . . . . 19

Section 8.1. Non-Competition. . . . . 19
Section 8.2. Non-Solicitation of Personnel . . . . 21
Section 8.3. Application . . . . 21
Section 8.4. Remedy for Breach . . . . 22
Section 8.5. Proprietary Information. . . . . 24
Section 8.6. Inventions. . . . . 25
Section 8.7. Termination. . . . . 26
Section 8.8. Waiver . . . . 27
Section 8.9. No Employment Agreement . . . . 27

ARTICLE IX

ARBITRATION . . . . . 28

Section 9.1. Arbitration . . . . . 28
Section 9.2. Reimbursement . . . . . 29

ARTICLE X

MISCELLANEOUS . . . . . 29

Section 10.1. Survival . . . . . 29
Section 10.2. Entire Agreement . . . . . 29
Section 10.3. Choice of Law . . . . . 29
Section 10.4. Amendment; Waiver . . . . . 30
Section 10.5. Severability . . . . . 30
Section 10.6. Counterparts; Signatures . . . . . 30
Section 10.7. Beneficiaries . . . . . 30
Section 10.8. Notices . . . . . 30
Section 10.9. Schedules and Exhibits . . . . . 31
Section 10.10. Assignability . . . . . 31
Section 10.11. Specific Performance . . . . . 32
Section 10.12. Legal Counsel . . . . . 32

## Schedules

Schedule 8.1 - Competitors
Schedule 8.6 - California Code

## Exhibits

Exhibit A - Form of Letter Regarding Discussions with Competitors
Exhibit B - LLC Operating Agreement

# MEMBER DISTRIBUTION AGREEMENT

MEMBER DISTRIBUTION AGREEMENT (this "Agreement"), effective as of the Effective Date (as hereinafter defined), by and among KPMG Consulting, Inc., a Delaware corporation ("Consulting, Inc."), KPMG Consulting, LLC, a Delaware limited liability company ("LLC" and collectively with Consulting, Inc., "Consulting"), KPMG LLP, a Delaware limited liability partnership ("KPMG"), and the individual named on the signature page hereto (the "Employee").

## WITNESSETH

**WHEREAS**, the Board of Directors of KPMG has determined that it would be advisable and in the best interests of KPMG and its principals and partners for KPMG to separate its Consulting Business (as hereinafter defined) from its other businesses so that from and after the Effective Date the Consulting Business will be held indirectly by Consulting, Inc. through its Subsidiaries (the "Separation") and in connection therewith for Consulting, Inc. to sell shares of its common stock, par value $.01 per share (the "Consulting Common Stock"), or its preferred stock to one or more strategic investors (the "Private Placement");

**WHEREAS**, KPMG has agreed to contribute, and cause to be contributed, to LLC (i) certain of the operating assets, properties and liabilities related to the Consulting Business held by KPMG and certain Subsidiaries of KPMG, (ii) the partners, principals and employees of KPMG related to the Consulting Business, including the Employee and (iii) all of the issued and outstanding shares of capital stock and other equity interests owned by KPMG in certain of KPMG's Subsidiaries and other entities in and through which the Consulting Business is conducted (the "Contribution");

**WHEREAS**, in connection with the Contribution, (i) Consulting or one or more of its Subsidiaries will assume certain liabilities and obligations arising out of or relating to the Consulting Business, and (ii) LLC will issue Membership Units (as hereinafter defined) of LLC to KPMG and to certain partners and principals of KPMG including the Employee;

**WHEREAS**, each partner and principal of KPMG who receives Membership Units, including the Employee, will exchange each such Membership Unit for one share of Consulting Common Stock, and KPMG has agreed to exchange all Membership Units held by it (except approximately one-half of one percent of the total outstanding Membership Units) for Consulting Common Stock and one or more notes issued by Consulting (the" Exchange");

**WHEREAS**, the Employee was, prior to the Separation and Exchange, a partner or principal of KPMG and, concurrent with the Contribution, Separation and Exchange, will become an employee of Consulting; and

**WHEREAS**, the Employee, KPMG, LLC and Consulting, Inc. have determined that it is in the mutual best interests of each of them to set forth certain agreements and understandings among them.

**NOW, THEREFORE**, in consideration of the mutual undertakings contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Employee, KPMG, Consulting Inc. and LLC agree as follows:

## ARTICLE I

## DEFINITIONS AND INTERPRETATIONS

**Section 1.1. Definitions.** As used in this Agreement, the following terms shall have the meanings set forth below.

"**Acts**" has the meaning specified in Section 2.5.

"**Affiliate**" means any Person controlling, controlled by, or under direct or indirect common control with a Party hereto, it being understood that KPMG International, KPMG Americas and other KPMG International member (either directly or indirectly as a subsidiary of a member), licensee or sublicensee firms are not Affiliates of the Parties hereto. It is further understood that, for the purpose of this definition, after the Separation, Consulting and its Subsidiaries shall not be deemed Affiliates of KPMG. For the purpose of this definition, the term "control" means the power to direct the management of an entity, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"**Agreement**" has the meaning specified in the Preamble.

"**Annual Compensation**" for any given fiscal year consists of the Employee's total compensation, including all base compensation, incentive compensation and any other compensation reported or to be reported on an IRS Form W-2 (or an IRS Form K-1, as the case may be) paid or payable by Consulting (or KPMG, or any Subsidiary of Consulting with which the Employee becomes employed or otherwise associated and receives reportable compensation, as the case may be) for such fiscal year.

"**Auditor Independence Rules**" means the auditor independence rules, as defined or interpreted by the American Institute of Certified Public Accountants, the Securities and Exchange Commission, the ISB, the state boards of accountancy and any other regulatory authority exercising competent jurisdiction over KPMG, as the same may be amended from time to time.

"**Change of Control Event**" means:

(a) a sale or transfer of all or substantially all of the assets of Consulting on a consolidated basis in any transaction or series of related transactions; or

(b) any merger, consolidation or reorganization to which Consulting is a party, except for a merger, consolidation or reorganization in which Consulting is the surviving corporation and, after giving effect to such merger, consolidation or reorganization, the holders of the Consulting's outstanding equity (on a fully-diluted basis) immediately prior to the merger, consolidation or reorganization will own in the aggregate immediately following the merger, consolidation or reorganization Consulting's outstanding equity (on a fully diluted basis) either (i) having the ordinary voting power to elect a majority of the members of Consulting's board of directors to be elected by the holders of Common Stock and any other class which votes together with the Common Stock as a single class or (ii) representing at least 50% of the equity value of Consulting as reasonably determined by the Board; or

(c) individuals who, as of the date hereof, constitute the Board of Directors of Consulting (the "Incumbent Board") cease for any reason to constitute at least a majority of such Board; provided, however, that any individual who becomes a director of Consulting subsequent to the date hereof whose election, or nomination for election by the holders of Consulting's equity, was approved by the vote of at least a majority of the directors then comprising the Incumbent Board shall be deemed to have been a member of the Incumbent Board; and provided further, that no individual who was initially elected as a director of Consulting as a result of an actual or threatened election contest, as such terms are used in Rule 14a-11 of Regulation 14A promulgated under the Exchange Act, or any other actual or threatened solicitation of proxies or consents by or on behalf of any Person other than the Board shall be deemed to have been a member of the Incumbent Board; or

(d) any person or group (as defined under Section 13(d) of the Exchange Act), other than KPMG or its Affiliates, acquires beneficial ownership of 30% or more of the outstanding equity of Consulting generally entitled to vote on the election of directors.

"**Chief Executive Officer**" means the Chief Executive Officer or Co-Chief Executive Officer of Consulting, Inc.

"**Cisco**" has the meaning specified in Section 8.1.

"**Cisco Alliance**" has the meaning specified in Section 8.1.

"**Client**" means any individual, person, firm or other entity that is a client of Consulting or any of its Subsidiaries at the time, in each case, the Employee seeks to solicit or perform services for such client as a former employee of Consulting or any of its Subsidiaries or

was a client of Consulting or any of its Subsidiaries (or, prior to the Separation, a client of KPMG) within twelve (12) months prior to such time and with respect to whom, the Employee: (i) performed Consulting Services on behalf of Consulting or any of its Subsidiaries (or, prior to the Separation, KPMG), or (ii) had substantial contact or acquired or had access to Proprietary Information or other substantial information as a result of or in connection with the Employee's employment with Consulting or any of its Subsidiaries (or, prior to the Separation, as a result of or in connection with the Employee's association with KPMG) each at any time during the two (2) year period preceding the date on which the Employee's employment with Consulting or any of its Subsidiaries terminates for any or no reason.

"**Consulting**" has the meaning specified in the Preamble (except as otherwise specifically defined in particular provisions of this Agreement).

"**Consulting Business**" means, for purposes of this Agreement only, the management and information technology consulting business as conducted by Consulting or any of its Subsidiaries from time to time.

"**Consulting, Inc.**" has the meaning specified in the Preamble.

"**Consulting Common Stock**" has the meaning specified in the Recitals.

"**Consulting Services**" means the Consulting Business services provided by (a) Consulting or (b) any Subsidiary of Consulting with which the Employee becomes employed or otherwise associated, either (i) as of the date hereof, (ii) during the Employee's employment with Consulting and (iii) as of any date on which the Employee's employment with Consulting terminates for any or no reason.

"**Contribution**" has the meaning specified in the Recitals.

"**Disputes**" has the meaning specified in Section 9.1.

"**Effective Date**" means the close of business on the date on which the closing of the Separation, Contribution and Exchange occur.

"**Effective Time**" means the time on the Effective Date at which the closing of the Separation shall occur.

"**Exchange**" has the meaning specified in the Recitals.

"**Expiration Date**" means the first date which is the later of (i) one year from the Effective Date and (ii) a date after the consummation of an IPO on which KPMG and its partners, principals and former partners and principals may, pursuant to any Lock-Up Agreement signed in connection with the IPO, sell shares of Consulting Common Stock.

Earliest (latest is ... after IPO)
Jan 31, 2001 → 40% pursuant to [illegible]
period.
Jan 31, 2002 → Addl 15%
Jan 31, 2003 → Addl 15%
'' Addl 15%.

"**Independence Conflict**" has the meaning specified in Section 5.1.

"**Involuntary Transfer**" means any Transfer pursuant to the laws of descent, inheritance, bankruptcy or insolvency, as a result of the dissolution of marriage, due to the execution of a lien or other judgment or other transfer by operation of law.

"**ISB**" means the Independence Standards Board.

"**IPO**" means an initial public offering of Consulting Common Stock pursuant to an effective registration statement under the Securities Act.

"**Issued Consulting Common Stock**" means Consulting Common Stock issued to the Employee in connection with the Exchange and any shares of Consulting Common Stock issued as dividends thereon or received as the result of stock splits, reclassifications, stock dividends or similar changes.

"**Issued Equity**" means the Issued Membership Units and the Issued Consulting Common Stock.

"**Issued Membership Units**" means the Membership Units issued to the Employee in connection with the Separation and any Membership Units issued as dividends thereon or received as the result of splits, reclassifications, equity dividends or similar changes.

"**KPMG**" has the meaning specified in the Preamble.

"**KPMG Partnership Agreement**" means the Partnership Agreement of KPMG as currently in force or as may be amended from time to time.

"**KPMG Plans and Policies**" has the meaning specified in Section 6.5(b).

"**LLC Operating Agreement**" has the meaning specified in Section 4.5.

"**Lock-Up Agreements**" has the meaning specified in Section 3.3.

"**Membership Units**" means Membership Units in LLC representing an equity interest of a member in the LLC.

"**Notification**" means all notices permitted or required to be given to any Person hereunder.

"**Party**" means KPMG, Consulting, Inc., LLC or the Employee.

"**Person**" shall mean an individual, corporation, partnership, limited liability company, unincorporated syndicate, unincorporated organization, entity, trust, trustee, executor,

administrator or other legal representative, governmental authority or agency, or any group of Persons acting in concert.

"**Private Placement**" has the meaning specified in the recitals.

"**Proprietary Information**" means all information or material disclosed to or known by the Employee as a consequence of the Employee's employment or engagement by Consulting, any of its Subsidiaries or KPMG, including, without limitation, third party information that Consulting, any of its Subsidiaries or KPMG treats as confidential and any information disclosed to or developed by the Employee or embodied in or relating to the Works. Proprietary Information includes, but is not limited to, the following types of information and other information of a similar nature (whether or not reduced to writing): discoveries, ideas, inventions, concepts, software in various states of development and related documentation, designs, drawings, specifications, techniques, methodologies, models, data, source code, object code, documentation, diagrams, flow charts, research, development, processes, training materials, templates, procedures, "know-how," tools, client identities, client accounts, web design needs, client advertising needs and history, client reports, client proposals, product information and reports, accounts, billing methods, pricing, data, sources of supply, business methods, production or merchandising systems or plans, marketing, sales and business strategies and plans, finances, operations, and information regarding employees. Notwithstanding the foregoing, information publicly known that is generally employed by the trade at or after the time Employee first learns of such information (other than as a result of the Employee's breach of this Agreement), shall not be deemed part of the Proprietary Information.

"**Prospective Client**" means any individual, person, firm or other entity that is not a Client but with respect to whom, the Employee: (i) conducted, prepared or submitted, or assisted in conducting, preparing or submitting, any proposal or client development or marketing efforts on behalf of Consulting, any of its Subsidiaries or, prior to the Separation, KPMG, or (ii) had substantial contact or acquired or had access to Proprietary Information or other substantial information as a result of or in connection with the Employee's employment with Consulting or any of its Subsidiaries (or, prior to the Separation, as a result of or in connection with the Employee's association with KPMG) each at any time during the one (1) year period preceding the date on which the Employee's employment with Consulting or any of its Subsidiaries terminates for any or no reason.

"**Released Parties**" means (i) KPMG and its past, present, and future parents, divisions, subsidiaries, partnerships, affiliates, benefit plans and other related entities (whether or not such entities are wholly owned); (ii) the past, present, and future owners, trustees, fiduciaries, administrators, shareholders, directors, officers, partners, principals, members, agents, representatives, employees, and attorneys of each entity listed in (i); and (iii) the predecessors, successors, and assigns of each entity listed in (i) and (ii).

"**Repurchase Price**" means, (i) if the Consulting Common Stock is not listed for trading on a national securities exchange or any automatic quotation system (including the Nasdaq

Stock Market), as of any date of determination, the lower of the fair market value of the Consulting Common Stock (as determined by the Board of Directors of Consulting) or $12 per share of Consulting Common Stock, and (ii) if the Consulting Common Stock is listed for trading, then, as of any date of determination, the average of the per share closing prices of the Consulting Common Stock on such national securities exchange or quotation system on the five trading days immediately preceding such date of determination.

"**Restricted Firms**" has the meaning specified in Section 8.1(a)(i).

"**Restricted Period End Date**" means the later of (i) the date after the consummation of an IPO on which KPMG and its partners, principals and former partners and principals may, pursuant to any Lock-Up Agreement signed in connection with the IPO, sell shares of Common Stock and (ii) the date on which the Employee is able to sell the Issued Equity pursuant to Rule 144 under the Securities Act.

"**Securities Act**" has the meaning specified in Section 2.1.

"**Separation**" has the meaning specified in the Recitals.

"**Subsidiary**" means, when used with reference to any Party, any corporation, partnership, limited liability company, or other entity, a majority of the outstanding voting power of which is owned directly or indirectly by such Party, provided, however, that for purposes of this definition, after the Separation, neither Consulting nor any of its Subsidiaries (including any Subsidiaries transferred pursuant to the Separation) shall be deemed Subsidiaries of KPMG.

"**Transfer**" has the meaning specified in Section 3.1.

"**Works**" means (i) any inventions, trade secrets, ideas or original works of authorship that the Employee conceives, develops, discovers or makes in whole or in part during the Employee's employment or engagement by Consulting or any of its Subsidiaries, or which the Employee conceived, developed, discovered or made in whole or in part during the Employee's relationship with KPMG which relate to the business of Consulting or any of its Subsidiaries or Consulting's or any of its Subsidiaries' actual or demonstrably anticipated research or development, (ii) any inventions, trade secrets, ideas or original works of authorship that the Employee conceives, develops, discovers or makes in whole or in part during or after the Employee's employment or engagement by Consulting or any of its Subsidiaries, or conceived, developed, discovered or made in whole or in part during Employee's relationship with KPMG, either of which are made through the use of any of Consulting's, any of its Subsidiaries' or KPMG's equipment, facilities, supplies, trade secrets or time, or which result from any work the Employee performs or performed for Consulting, any of its Subsidiaries or KPMG, and (iii) any part or aspect of any of the foregoing.

**Section 1.2. Rules of Construction.** (a) In this Agreement, unless a clear contrary intention appears:

(i) the singular number includes the plural number and vice versa;

(ii) a reference to any Person includes such Person's successors and assigns but, if applicable, only if such successors and assigns are permitted by this Agreement;

(iii) a reference to any gender includes the other gender;

(iv) a reference to any Section or Exhibit or Schedule means such Section of this Agreement or such Exhibit or Schedule to this Agreement, as the case may be, and references in any Section or definition to any clause means such clause of such Section or definition;

(v) "herein," "hereunder," "hereof, " "hereto" and words of similar import shall be deemed references to this Agreement as a whole and not to any particular Section or other provision hereof or thereof;

(vi) "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding such term;

(vii) relative to the determination of any period of time, "from" means "from and including," "to" means "to but excluding" and "through" means "through and including";

(viii) accounting terms used herein shall have the meanings historically attributed to them by KPMG and its Subsidiaries prior to the Separation;

(ix) in the event of any conflict between the provisions of the body of this Agreement and the Exhibits or Schedules hereto, the provisions of the body of this Agreement shall control; and

(x) the headings contained in this Agreement have been inserted for convenience of reference only and are not to be used in construing this Agreement.

(b) The Schedules and Exhibits to this Agreement may be amended prior to the Effective Date upon the mutual consent of the Parties.

(c) Any rule of construction or interpretation otherwise requiring this Agreement to be construed or interpreted against either Party shall not apply to any construction or interpretation hereof.

## ARTICLE II

## ACCREDITED INVESTOR REPRESENTATIONS

As an inducement to KPMG and Consulting to enter into this Agreement and to consummate the transactions contemplated hereby the Employee hereby represents and warrants to KPMG and Consulting and agrees as follows:

**Section 2.1.** **Investment Purpose**. The Employee is acquiring each of the Issued Membership Units and the shares of Issued Consulting Common Stock for investment and solely for such Employee's own account and not with a view toward reselling or distributing such Membership Units or Consulting Common Stock in any transaction that would constitute a "distribution" within the meaning of the Securities Act of 1933, as amended (the "Securities Act").

**Section 2.2.** **Financial Capacity**. The Employee is financially able to bear the economic risk of an investment in Consulting (including the loss of the entire investment) and has no need for liquidity in this investment.

**Section 2.3.** **Knowledge**. The Employee has such knowledge, experience and skill in financial and business matters in general and with respect to investments of a nature similar to an investment in Consulting so as to be capable of evaluating the merits and risks of, and making an informed business decision with regard to, this investment. The Employee acknowledges and understands that the receipt of the Issued Equity involves an investment in a new business that has no previous operating experience as an independent entity, and, therefore, is a speculative investment with no assurance of success.

**Section 2.4.** **Information**. The Employee (i) has received all information that the Employee deems necessary to evaluate the merits and risks of, and to make an informed decision with respect to, an investment in Consulting; (ii) has had the unrestricted opportunity to make such investigation as the Employee desires pertaining to the Contribution, Separation, and the Exchange and to verify any information furnished to the Employee; and (iii) has had the opportunity to ask questions of representatives of KPMG and Consulting concerning the Contribution, the Separation and the Exchange.

**Section 2.5.** **Holding Period**. The Employee understands that the Employee must bear the economic risk of an investment in Consulting for an indefinite period of time because (i) the Issued Equity has not been registered under the Securities Act and applicable state securities laws (collectively the "Acts") and (ii) the Issued Equity may not be sold, transferred, pledged or otherwise disposed of except in accordance with this Agreement and then only if it is subsequently registered in accordance with the provisions of the Acts or registration under the Acts is not required.

X019045

**Section 2.6.** **Unregistered Securities**. The Employee understands that: (i) the Company is not obligated to register the Issued Equity for resale under the Acts; (ii) Consulting, Inc., LLC and KPMG are relying upon exemptions from registration under the Acts, based in part on the Employee's representations; and (iii) neither Consulting, Inc., LLC nor KPMG is obligated to supply the Employee with information or assistance in complying with any exemption under Acts. Upon the request of Consulting, Inc. or LLC, the Employee will provide Consulting, Inc. or LLC, as the case may be, with an opinion of counsel satisfactory to Consulting, Inc. or LLC, as the case may be, that any proposed Transfer of the Issued Membership Interests or the Issued Consulting Common Stock, as the case may be, complies with the Acts.

**Section 2.7.** **Due Authorization; No Conflicts**. (a) This Agreement has been duly executed and delivered by the Employee and constitutes the Employee's legal, valid and binding obligation, enforceable against the Employee in accordance with its terms. The Employee is legally competent to execute this Agreement and any other documents delivered herewith.

(b) The execution, delivery and performance under this Agreement by the Employee will not breach the terms or provisions of any other agreement or obligation to which the Employee is bound.

**Section 2.8.** **Accredited Investor Status**. The Employee represents and warrants that he or she either:

(a) as of August 31, 1999 had a net worth (or joint net worth together with his or her spouse) in excess of $1,000,000; or

(b) had an annual income during each of the calendar years 1997 and 1998 in excess of $200,000 (or joint income together with his or her spouse in excess of $300,000) and as of August 31, 1999 reasonably expected to have an annual income in excess of $200,000 (or joint income together with his or her spouse of in excess of $300,000) during the calendar year 1999.

**Section 2.9.** **Legend**. The Employee acknowledges that all Issued Equity shall bear a legend in substantially the following form:

> THESE [MEMBERSHIP UNITS] [SHARES OF COMMON STOCK] HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE OFFERED OR SOLD UNLESS THEY HAVE BEEN REGISTERED UNDER SUCH SECURITIES ACT OR SUCH STATE SECURITIES LAWS OR UNLESS AN EXEMPTION FROM REGISTRATION OR SUCH STATE SECURITIES LAWS IS AVAILABLE. THESE [MEMBERSHIP UNITS] [SHARES OF COMMON STOCK] ARE ALSO SUBJECT TO RESTRICTIONS ON TRANSFER, AND OTHER TERMS AND CONDITIONS, SET FORTH IN THE MEMBER DISTRIBUTION AGREEMENT, A COPY OF WHICH MAY

BE OBTAINED FROM THE ISSUER AT ITS PRINCIPAL EXECUTIVE OFFICES.

**Section 2.10. Disclosure of Information**. The Employee acknowledges that in connection with demonstrating compliance with certain provisions of the Acts, Consulting or KPMG may be required or requested to disclose certain information in the possession of Consulting or KPMG regarding the Employee including, but not limited to, information contained in or relating to the Employee's Form W-2 or K-1, as the case may be, and information provided by the Employee regarding the Employee's net worth. The Employee authorizes Consulting and/or KPMG to disclose any such information to the extent necessary or appropriate to comply with any request from or in connection with any investigation by any regulatory or governmental authority or agency, including, but not limited to, the Securities and Exchange Commission.

## ARTICLE III

## STOCK TRANSFER RESTRICTIONS

**Section 3.1. Transfer Restrictions**. (a) Except in the case of an Involuntary Transfer in accordance with Section 3.1(b) and except as otherwise expressly permitted by this Agreement, the Employee may not sell, transfer or otherwise dispose of, hypothecate, pledge or otherwise encumber (voluntarily or involuntarily) (any such sale, transfer, disposition, hypothecation, pledge or encumbrance being referred to as a "Transfer") any Issued Equity.

(b) In the event of an Involuntary Transfer of some or all of the Employee's Issued Equity at a time when such Issued Equity is subject to the restrictions on transfer imposed by this Agreement:

(i) the Employee (or the Employee's estate) shall immediately furnish to Consulting a Notification of such Involuntary Transfer at least 30 days prior to the effective date of the Involuntary Transfer (or, in the case of the Employee's death, within 30 days after the death); and

(ii) for a period of 20 days commencing on the date of its receipt of a Notification, Consulting shall have the exclusive right, but not the obligation, to purchase some or all of the Issued Equity that is the subject of the Notification. If Consulting desires to purchase any or all of such Issued Equity, it will provide Notification of such desire to the Employee or the Employee's estate within such 20 day period, and the purchase price shall equal the Repurchase Price determined as of the date of the Notification to the Employee (or the Employee's estate).

(c) The closing of any purchase by Consulting of any Issued Equity as provided in Section 3.1(b) shall take place on such date as designated by Consulting occurring within 15 days after receipt by the Employee (or the Employee's estate) of Notification from Consulting of the exercise of Consulting's right to purchase hereunder. At the closing of any purchase of Issued

Equity, the Employee (or the Employee's estate) will transfer, assign and deliver, or cause to be transferred, assigned and delivered to Consulting any certificates or other evidence representing Issued Equity being purchased, duly endorsed or accompanied by transfer powers duly executed by the Employee or his or her duly appointed legal representative or authorized agent with such signature thereon duly guaranteed. Upon the delivery of and payment for any Issued Equity as contemplated in this Agreement, Consulting shall receive good title to such Issued Equity free and clear of any lien, claim, equity or encumbrance of any nature whatsoever. Upon request by Consulting, the Employee (or the Employee's estate) shall deliver an opinion of counsel, reasonably acceptable to Consulting, as to the matters contained in the preceding sentence and as to such other matters as Consulting may reasonably request.

(d) If, after compliance with the foregoing provisions of Section 3.1(b), Consulting fails to purchase any of the Issued Equity subject to Involuntary Transfer, then the Involuntary Transfer of such unpurchased Issued Equity may occur; provided, however that any such Transfer will be null and void unless such Transfer complies in full with Section 3.4.

(e) If any of the Issued Equity is Transferred pursuant to Section 3.1(d), the Employee (or the Employee's estate) shall be responsible for compliance with all conditions of Transfer imposed by this Agreement and under applicable law and for any expenses incurred by Consulting for legal and/or accounting services in connection with reviewing any proposed Transfer or issuing opinions in connection therewith.

**Section 3.2. Permitted Transfers.** Subject to the restrictions set forth in Sections 3.4 and 8.4:

(a) On or after the Expiration Date, the Employee may Transfer up to 40% of the Employee's Issued Equity. Subject to Section 3.2(b), the remaining 60% of the Employee's Issued Equity shall remain subject to the restrictions set forth in Section 3.1 and may be Transferred only in compliance with Section 3.1.

(b) On each of the first, second and third anniversaries of the Expiration Date, an additional 15% of the Employee's Issued Equity may be Transferred without the restrictions set forth in Section 3.1. On the fourth anniversary of the Expiration Date, none of the Employee's Issued Equity will be subject to Section 3.1(b).

**Section 3.3. Lock-Up Provisions.** The Employee acknowledges that in connection with the IPO, the Employee, KPMG, Consulting, Inc. and the other individuals holding equity interests in Consulting may be required by the underwriters of the IPO to enter into agreements not to sell, offer, contract to sell or otherwise transfer or dispose of shares of Consulting Common Stock, directly or indirectly, for a period of time following the IPO ("Lock-Up Agreements"). If requested by Consulting, the Employee hereby (i) agrees to enter into a customary Lock-Up Agreement with respect to the Employee's Issued Equity with the underwriters chosen by Consulting in conjunction with the IPO, and (ii) authorizes the holder or holders of the power of attorney granted pursuant to Article VII hereof to execute such a

customary Lock-Up Agreement on behalf of, and in the name of, the Employee without any further act of the Employee.

**Section 3.4.** **General Transfer Restrictions.** (a) Any purported Transfer of Issued Equity in violation of the provisions of this Agreement or the Acts shall be wholly void and shall not effectuate the Transfer contemplated thereby.

(b) In the event the Employee Transfers Issued Equity other than pursuant to an effective registration statement under the Securities Act, the Employee shall, upon the request of Consulting, provide Consulting with a written opinion of counsel, reasonably acceptable to Consulting, that the Transfer is in full compliance with this Agreement and the Acts.

(c) Any purported Transfer pursuant to Sections 3.1 or 3.2 shall be wholly void and shall not effectuate the Transfer contemplated thereby unless, prior to the consummation thereof, the transferee agrees in writing in a form reasonably acceptable to Consulting to be bound by the restrictions set forth in this Article III, Article IV, and Article V and makes the representations and warranties set forth in Article II.

(d) If at any time prior to the fifth anniversary of the Effective Date, the Employee requests the removal of any restrictive legends on his or her certificates representing Consulting Common Stock or seeks to Transfer any Issued Equity at a time when such Issued Equity is subject to the restrictions on Transfer imposed by this Agreement, the Employee shall, prior to any removal of legends or Transfer of Issued Equity, execute a letter, substantially in the form attached hereto as Exhibit A, pursuant to which the Employee shall represent and warrant to Consulting that, (i) for a period of six months prior to such Transfer the Employee has not engaged in any discussions or other communications with any Restricted Firm regarding the possibility of the Employee becoming formally or informally associated with such Restricted Firm and (ii) has no current intention to commence such discussions or other communications or become formally or informally associated with such Restricted Firm.

**Section 3.5.** **Change of Control.** In the event of a Change of Control Event that has not been approved or ratified by a majority of the Incumbent Board of Consulting, Inc., the transfer restrictions set forth in Section 3.1 shall no longer apply to any Issued Equity.

**Section 3.6.** **Certain Transfers.** Notwithstanding any provision herein to the contrary, the Employee may make any Transfer required pursuant to Section 5.4 without complying with the provisions of this Article III.

## ARTICLE IV

## THE EXCHANGE

**Section 4.1. Exchange.** The Employee hereby agrees that as of the Effective Time, the Employee shall take any and all actions necessary to complete the Exchange, including any actions set forth in this Article IV.

**Section 4.2. Exchange Terms.** The Employee hereby agrees that, as of the Effective Time, without any further action on the part of the Employee, Consulting, Inc. or LLC, each Issued Membership Unit held by the Employee immediately prior to the Effective Time shall be exchanged for one share of Consulting Common Stock. Upon such Exchange, the Employee shall cease to have any rights with respect to the Issued Membership Units, except the right to receive shares of Consulting Common Stock.

**Section 4.3. Delivery of Certificates.** As soon as reasonably practicable after the Effective Time, Consulting, Inc. shall deliver or cause to be delivered to the Employee one or more certificates representing the aggregate number of shares of Consulting Common Stock into which the Issued Membership Units shall have been exchanged pursuant to Section 4.2.

**Section 4.4. Dividends and Distributions.** The Employee shall be deemed a holder of record of shares of Consulting Common Stock as of the Effective Date for purposes of any dividend or other distribution paid in respect of Consulting Common Stock to holders of record, or the solicitation of any votes or consents, on or after the Effective Date.

**Section 4.5. LLC Agreement.** The Employee hereby agrees to the provisions of, adopts and acknowledges the Limited Liability Company Operating Agreement for LLC, dated as of the Effective Date, substantially in the form attached hereto as Exhibit B (the "LLC Operating Agreement").

## ARTICLE V

## DIVESTITURES RELATED TO AUDITOR INDEPENDENCE

**Section 5.1. Independence Requirement.** The Employee acknowledges that Consulting is, and for an indefinite period of time after the Separation may continue to be, subject to the Auditor Independence Rules. The Employee agrees to abide at all times (including after any termination of employment with Consulting) by the Auditor Independence Rules applicable to KPMG and to take any and all action requested by the Board of Directors of KPMG in connection with such Auditor Independence Rules. The Employee agrees and understands that the breach of the covenant in the immediately preceding sentence may impair the independence of KPMG (an "Independence Conflict").

**Section 5.2.** __Separation Prior to the Restricted Period End Date__. In the event the Employee terminates his or her employment with Consulting for any reason or no reason (including, without limitation, voluntary resignation by the Employee or termination at the request of Consulting) prior to the Restricted Period End Date and accepts new employment which, in the sole judgment of KPMG, causes an Independence Conflict at any time by virtue of the Employee's ownership of the Consulting Common Stock, the Employee agrees and acknowledges that (i) all of the Employee's Issued Equity shall be immediately forfeited and surrendered to Consulting without any compensation therefor, without any further act on the part of Consulting or the Employee, and (ii) all such forfeited and surrendered Issued Equity shall be canceled and no longer considered outstanding on the books and records of LLC or Consulting, Inc. as the case may be.

**Section 5.3.** __Separation After the Restricted Period End Date__. In the event the Employee terminates his or her employment with Consulting for any reason or no reason (including, without limitation, voluntary resignation by the Employee or termination at the request of Consulting) after the Restricted Period End Date but at a point in time when the Auditor Independence Rules continue to apply to certain employees of Consulting and its Affiliates, including the Employee, and accepts new employment which, in the sole judgment of KPMG, causes an Independence Conflict at any time by virtue of the Employee's ownership of the Consulting Common Stock, the Employee agrees that (i) Consulting will have the option, but not the obligation, to purchase any or all of such Consulting Common Stock at the market price on the date of termination by the Employee, and (ii) in the event that Consulting does not exercise the option set forth in (i), the Employee shall divest of such unpurchased Consulting Common Stock as soon as practicable. In the event that Consulting exercises its option set forth in (i), it shall observe the procedures for notice and closing set forth in __Section 3.1(b)__ and __3.1(c)__.

**Section 5.4.** __Auditor Independence Related Divestitures__. In the event that (i) the Board of Directors of KPMG determines that, in order to comply with the Auditor Independence Rules, it is necessary or appropriate for the Employee to divest some or all of the Employee's Issued Equity, the Employee hereby agrees to the sale or transfer of some or all of his Issued Equity at the times, in the amounts and on the terms, prices and conditions determined by the Board of Directors of KPMG. At the request of KPMG, the Employee shall take any and all actions necessary or appropriate, in the sole judgment of KPMG, to facilitate such divestiture, including the transfer of such Issued Equity to a person, trust or other entity for disposition or the granting of a power of attorney relating to the voting or disposition of such Issued Equity.

**Section 5.5.** __Covenants__. (a) The Employee covenants and agrees not to take any action directly or indirectly intended to or having the effect of eliminating the Independence Conflict contemplated by __Section 5.2__ or __Section 5.3__ by having an entity with which the Employee is subsequently affiliated resign any existing audit relationship with KPMG.

(b) In the event the Employee breaches the covenant set forth in __Section 5.5(a)__, the Employee agrees and acknowledges that, notwithstanding the lack of an Independence Conflict, (i) all of the Employee's Issued Equity shall be immediately forfeited and surrendered to

Consulting without any compensation therefor, without any further act on the part of Consulting or the Employee, and (ii) all such forfeited and surrendered Issued Equity shall be canceled and no longer considered outstanding on the books and records of LLC or Consulting, Inc. as the case may be.

## ARTICLE VI

## AGREEMENT TO WITHDRAW

**Section 6.1.** **Withdrawal**. The Employee agrees that, effective as of the Effective Date, this Agreement will serve as written notice pursuant to Section 10.1 of the KPMG Partnership Agreement of the Employee's voluntary withdrawal from KPMG. The Employee acknowledges that pursuant to the Separation Agreement, KPMG has agreed to waive the enforcement of the requirement pursuant to Section 10.1 of the KPMG Partnership Agreement that the Employee provide notice one hundred eighty (180) days prior to the effectiveness of such resignation and consequently that such withdrawal will be effective immediately as of the Effective Date; provided that (i) the Employee commences employment with Consulting or any of its Subsidiaries and (ii) the Employee complies with the Employee's obligations hereunder, including, but not limited to, those set forth in Section 8.7(a).

**Section 6.2.** **Consequences of Withdrawal**. (a) The Employee acknowledges that upon such withdrawal, (i) the Employee will forfeit his or her right to vote on matters affecting KPMG; (ii) KPMG will terminate with respect to the Employee; (iii) the Employee will no longer be a partner or principal of KPMG; and (iv) except as specifically provided in the KPMG Partnership Agreement or in the By-Laws of KPMG, the Employee will not be entitled to any further rights under the KPMG Partnership Agreement or By-Laws.

(b) Notwithstanding any provision herein to the contrary, the Employee shall receive the distributions provided for in Section 11 of the KPMG Partnership Agreement.

(c) The Employee further acknowledges that KPMG has agreed, pursuant to Section 6.12 of the Separation Agreement, to waive a breach of Section 12 of the KPMG Partnership Agreement in the event that, and only to the extent that, (i) such breach is also a breach of the covenants of the Employee set forth in Article VIII of this Agreement and (ii) Consulting or any of its Subsidiaries pursues its remedies under Article VIII of this Agreement.

**Section 6.3.** **Severance**. The Employee agrees and acknowledges that the Employee is not entitled to any severance payments from KPMG, Consulting or otherwise in connection with the Employee's withdrawal from KPMG or acceptance of employment with Consulting or any Subsidiary of Consulting, under any provision of the KPMG Partnership Agreement, common law, contract or otherwise.

Section 6.4. Release. (a) The Employee and anyone else claiming by or through the Employee agree not to sue and further agree to release KPMG and the other Released Parties with respect to any and all claims, whether currently known or unknown, that the Employee now has, has ever had, or may ever have, against KPMG or any of the other Released Parties arising from or related to the Employee's association with KPMG, compensation, benefits, other terms and conditions of association with KPMG, or the termination of such association, including, without limitation, any such claims that were or could have been asserted by the Employee or on the Employee's behalf: (x) in any federal, state, or local court, commission, or agency; (y) under any common law theory; or (z) under any employment, contract, tort, federal, state, or local law, regulation, ordinance, constitution or executive order.

Notwithstanding the foregoing, nothing herein shall affect: (I) any rights to indemnification that the Employee may have under the KPMG Partnership Agreement, the KPMG Bylaws, or otherwise, or (II) any vested rights that the Employee may have under the Retirement Allowance Plan (as amended), under the Supplemental Retirement Allowance Plan (as amended), or under any other plan or policy providing retirement benefits to the Employee. The Employee represents and warrants that: the Employee is the sole owner of the actual or alleged claims, demands, rights, causes of action, and other matters that are released in Sections 6.4(a) and (b); the same have not been transferred or assigned or caused to be transferred or assigned to any other person, firm, corporation or other legal entity; and the Employee has the full right and power to grant, execute, and deliver the releases, undertakings, and agreements contained in this Agreement.

(b) In the event that the Employee is or has been associated with KPMG in the State of California, the Employee has read and understands the following language contained in Section 1542 of the California Civil Code:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

Having reviewed this provision, the Employee nevertheless hereby voluntarily waives any and all rights under this statutory provision and releases KPMG and each of the other Released Parties with respect to any and all unknown or unsuspected claims arising from or related to the Employee's association with KPMG, compensation, benefits, other terms and conditions of association with KPMG, or the termination of such association, including, without limitation, all such claims that were or could have been asserted by the Employee or on the Employee's behalf: (x) in any federal, state, or local court, commission, or agency; (y) under any common law theory; or (z) under any employment, contract, tort, federal, state or local law, regulation, ordinance, constitution or executive order.

Section 6.5. Policies and Procedures. (a) The Employee acknowledges, understands and agrees that, effective upon the date of the Separation, the Employee shall be

covered by and shall be eligible to participate in such employee benefit and other plans, policies and procedures of Consulting and its Subsidiaries (including without limitation all plans, policies and procedures concerning or relating to retirement benefits, medical and dental coverage, and life insurance) as Consulting and its Subsidiaries may make available generally to their employees (collectively, "Consulting Plans and Policies"), subject to all terms and conditions of such Consulting Plans and Policies (as in effect or amended from time to time). Consulting and its Subsidiaries reserve the right in their sole discretion to alter, suspend, amend or discontinue any and all Consulting Plans and Policies, in whole or in part, at any time for any or no reason with or without notice.

(b) The Employee acknowledges, understands and agrees that, except as provided below in this Section, any and all benefit and other plans, policies and procedures of KPMG and its Subsidiaries (including without limitation all plans, policies and procedures concerning or relating to retirement benefits, medical and dental coverage, and life insurance) (collectively, "KPMG Plans and Policies") that applied to the Employee during the Employee's association with KPMG shall no longer apply to the Employee effective upon the Effective Date, provided that any KPMG Plans and Policies that by their terms provide for continued application to the Employee after the termination of the Employee's association with KPMG shall continue to apply to the Employee in accordance with the terms and conditions of such KPMG Plans and Policies (as in effect or amended from time to time), and provided further that the Employee's participation (if any) in and rights (if any) under any KPMG Plans and Policies concerning retirement, medical or other benefits shall be determined in accordance with the terms and conditions of such KPMG Plans and Policies. KPMG reserves the right in its sole discretion to alter, suspend, amend, or discontinue any and all KPMG Plans and Policies, in whole or in part, at any time for any or no reason with or without notice.

(c) Notwithstanding anything to the contrary in the foregoing, and except as provided in Section 6.2(c), nothing in this Section 6.5 shall or shall be construed to restrict, limit or otherwise affect any rights that Consulting or KPMG or their Affiliates may have or any obligations that the Employee may have under any provision of the KPMG Partnership Agreement, the By-Laws of KPMG or otherwise, it being understood and agreed that the provisions of the KPMG Partnership Agreement and the By-Laws of KPMG (as in effect or amended from time to time) shall continue in full force and effect in accordance with their terms.

## ARTICLE VII

## POWER OF ATTORNEY

**Section 7.1.** **Power of Attorney.** The Employee hereby appoints the Chief Executive Officer as the Employee's attorney-in-fact for the purpose of executing, swearing to, acknowledging and delivering any and all certificates, agreements, stock transfer powers or documents and other instruments as may be necessary, appropriate or advisable in the sole judgment of such Chief Executive Officer in furtherance of the Separation, the Contribution, the

distribution of the Issued Membership Units, the Exchange, the IPO and compliance with the Auditor Independence Rules including, but not limited to, the agreements and instruments contemplated by Section 3.3 and Article V. This power of attorney is irrevocable and coupled with an interest. On the request of the Chief Executive Officer, the Employee shall confirm his or her grant of this power of attorney or any use thereof by the Chief Executive Officer and shall execute, swear to, acknowledge and deliver any such certificate, agreement, document or other instrument related thereto. The Employee hereby grants unto such attorney-in-fact full power of substitution, delegation and revocation.

## ARTICLE VIII

## ADDITIONAL AGREEMENTS

**Section 8.1. Non-Competition.** The Employee acknowledges, understands and agrees that the extraordinary transactions contemplated by the Separation, the related conversion of the Employee's former indirect ownership interest in the Consulting Business to a direct ownership of Shares of Consulting Common Stock, the Private Placement, the associated alliance (the "Cisco Alliance") of Consulting with Cisco Systems, Inc. ("Cisco"), and the anticipated IPO present KPMG, Consulting (which term shall include throughout the remainder of this Article VIII, except to the extent specifically provided otherwise herein, the Subsidiaries of Consulting with which the Employee becomes employed or otherwise associated) and the Employee with a unique and unprecedented opportunity to receive significant financial benefits and value that will materially and substantially benefit KPMG, Consulting, the Employee, and the other employees of Consulting, which benefits and value include, without limitation, the granting to the Employee of a direct equity interest in Consulting (and an indirect equity interest in its Subsidiaries), the enhancement of Consulting's overall competitive position, and the establishment of a significant compensation structure. The Employee further acknowledges, understands and agrees that the Employee and Consulting stand to earn further substantial and material value in conjunction with the anticipated IPO; that the Employee potentially will be eligible to receive such benefits and value from the Separation, the Private Placement, the Cisco Alliance and the anticipated IPO even after the Employee's employment with Consulting ends; and that the full realization of these enhanced benefits and value critically depends on continued cooperation and mutual reliance among the Employee and the other employees of Consulting in pursuit of Consulting's competitive objectives following the Separation, the Private Placement, the Cisco Alliance and the anticipated IPO, including after the end of the Employee's association with Consulting. The Employee further acknowledges, understands and agrees that, during the Employee's employment and as a result of the Separation, the Employee will have access to and will develop relationships with clients and employees and other agents of Consulting, and that Consulting's relationships with its clients, employees and other agents are extremely valuable assets in which Consulting will continue to invest substantial time, effort and expense. Accordingly, the Employee acknowledges, understands and agrees that the Employee bears an enhanced duty of the utmost loyalty to Consulting and to the other employees of Consulting who stand to receive benefits and value from the Separation, the Private Placement, the Cisco Alliance and the anticipated IPO

(each of whom is assuming an identical duty that will inure to the Employee's benefit), which duty includes, without limitation, a responsibility to act only in furtherance of, and not contrary to, Consulting's business objectives upon which the Separation, the Private Placement, the Cisco Alliance and the anticipated IPO are premised. In furtherance of these objectives and this enhanced duty, the Employee also agrees to undertake the obligations in this Article VIII which the Employee acknowledges are reasonably designed to protect the legitimate business interests of Consulting and the benefits, value and opportunity accruing to Consulting, the Employee, and Consulting's other employees as a result of the Separation, the Private Placement, the Cisco Alliance and the anticipated IPO, without unreasonably or unnecessarily restricting the Employee's remunerative opportunities should the Employee leave Consulting.

(a) Except in furtherance of the Employee's services for Consulting, the Employee shall not, during the Employee's employment with Consulting and thereafter until the later of (i) five (5) years after the Effective Date or (ii) one (1) year after the date on which the Employee's employment with Consulting terminates for any or no reason (including, without limitation, voluntary resignation by the Employee or termination at the request of Consulting), directly or indirectly:

(i) Become employed or retained to perform services involving Consulting Services by, or perform services in any other capacity (whether as a sole proprietor, owner, employer, partner, principal, investor, joint venturer, shareholder, associate, employee, member, consultant, or otherwise) involving Consulting Services for, or on behalf of, any of the entities set forth in Schedule 8.1 to this Agreement or any of the affiliates, related entities, successors or assigns of any of them (collectively, "Restricted Firms") anywhere in the world where the Restricted Firms do business at the time the Employee seeks to perform Consulting Services; or

(ii) Engage or assist any other individual, person, firm or other entity in engaging in the performance of Consulting Services (whether as a sole proprietor, owner, employer, partner, principal, investor, joint venturer, shareholder, associate, employee, member, consultant, or otherwise) in association with (I) any other principal, officer or manager of Consulting (or other individuals with comparable levels of seniority), or (II) any individual who was a principal, officer or manager of Consulting (or other individuals with comparable levels of seniority) or a partner, principal or manager of KPMG within the twelve (12) month period preceding the date of termination of the Employee's employment with Consulting or the twelve (12) month period preceding the date on which the Employee seeks to perform Consulting Services with such an individual, whichever is later, anywhere in the world where Consulting does business at the time the Employee seeks to perform Consulting Services.

Notwithstanding the foregoing, with respect to the equity of any of the Restricted Firms which is or becomes publicly traded, the Employee's ownership as a passive investor of less than 1% of the outstanding publicly traded capital stock of a Restricted Firm shall not be deemed a violation of the foregoing clauses (i) or (ii).

(b) Except in furtherance of the Employee's services for Consulting, the Employee shall not, during the Employee's employment ~~with Consulting~~ and thereafter until the later of (i) five (5) years after the Effective Date or (ii) two (2) years after the date on which the Employee's employment with Consulting terminates for any or no reason (including, without limitation, voluntary resignation by the Employee or termination at the request of Consulting), directly or indirectly (whether as a sole proprietor, owner, employer, partner, principal, investor, joint venturer, shareholder, associate, employee, member, consultant, or otherwise): (i) perform or provide or assist any other individual, person, firm or other entity in performing or providing Consulting Services for any Client or Prospective Client; or (ii) solicit or assist any other individual, person, firm or other entity in soliciting any Client or Prospective Client for the purpose of performing or providing any Consulting Services.

(c) Notwithstanding the foregoing, in the event that the Employee's employment with Consulting terminates for any or no reason and the Employee does not engage in or perform services of any kind involving Consulting Services (whether individually, for or in association with any of the Restricted Firms, or for or in association with any other individual, person, firm or other entity) during the one (1) year period following the date on which the Employee's employment with Consulting terminates, and the Employee represents and warrants to the satisfaction of Consulting, Inc. or LLC, in a writing directed to Consulting, Inc.'s or LLC's General Counsel at the conclusion of such one (1) year period that the Employee has not engaged in or performed any such services in any such capacity, Consulting, Inc. or LLC shall, after receipt and review of such representation and warranty to determine its sufficiency, release the Employee in writing from the continuing obligations, if any, that the Employee may have under Section 8.1(a).

**Section 8.2.** **Non-Solicitation of Personnel**. Except in furtherance of the Employee's services for Consulting, the Employee shall not, during the Employee's employment with Consulting and thereafter until the later of (i) five (5) years after the Effective Date or (ii) two (2) years after the date on which the Employee's employment with Consulting terminates for any or no reason (including, without limitation, voluntary resignation by the Employee or termination at the request of Consulting), directly or indirectly (whether as a sole proprietor, owner, employer, partner, investor, principal, joint venturer, shareholder, associate, employee, member, consultant, or otherwise) solicit, employ or retain, or assist any other individual, person, firm or other entity in soliciting, employing or retaining, any employee or other agent of Consulting (including, without limitation, any former employee or other agent who separated from Consulting (or, prior to the Separation, any partner, principal or employee of KPMG) within a twelve (12) month period before or after the date on which the undersigned Employee's employment with Consulting terminates) to perform Consulting Services for or on behalf of, or in affiliation in any manner with, the Employee or any individual, person, firm or other entity with which the Employee is or becomes employed, retained or otherwise associated.

**Section 8.3.** **Application**. In applying this Article VIII, the wishes or preferences of a Client or Prospective Client as to who shall perform its Consulting Services, or the fact that the Client or Prospective Client may also be a client of a third party with whom the Employee is

or becomes associated, shall neither be relevant nor admissible as evidence in any dispute arising under Article VIII.

Know about perf. cs for which BC is not eligible (OCI & SB)

**Section 8.4. Remedy for Breach.** In addition to and without in any way limiting any remedies at law or in equity that may be available to Consulting for any breach of this Agreement (including, without limitation, any remedies under Section 9.1(e) or 10.11 of this Agreement), and without in any way precluding or being construed to preclude Consulting from making a showing of irreparable injury or any other element that may be necessary to secure injunctive relief, the Employee agrees to undertake the following obligations and accept the following consequences in the event that the Employee breaches Sections 8.1 or 8.2:

(a) In the event that, during the five (5) year period following the Effective Date:

(i) The Employee breaches Section 8.1(a)(i) or 8.1(a)(ii), the Employee shall pay Consulting, Inc. (it being understood and agreed that the Employee shall deliver any amounts payable pursuant to this Section 8.4 to Consulting, Inc. and not to any of its Subsidiaries, and it being further understood that Consulting, Inc. shall take responsibility for apportioning any amounts paid hereunder among itself, LLC and their respective Subsidiaries as may be appropriate under the circumstances) an amount in cash equal to one hundred percent (100%) of the average Annual Compensation paid or payable to the Employee by Consulting over the course of the two completed fiscal years of Consulting immediately preceding the Consulting fiscal year in which the Employee's breach occurs, provided that:

(I) Solely for the purpose of this Section 8.4(a)(i), any period of time during which the Employee was associated with KPMG, and any amounts paid or to be paid by KPMG (whether as base compensation, incentive compensation or other compensation) during such period, shall be deemed to be included in determining the fiscal years during which the Employee was employed by Consulting and the amount of the Annual Compensation paid or payable by Consulting to the Employee for such fiscal years; and

(II) In the event that the Employee has been employed by Consulting (including, for purposes of this calculation, any period during which the Employee was associated with KPMG) for less than two (2) full fiscal years at the time of the Employee's breach, the Employee shall pay Consulting an amount in cash equal to one hundred percent (100%) of the Annual Compensation paid or payable to the Employee by Consulting (including, for this purpose, KPMG) during the most recent completed full fiscal year during which the Employee was employed by Consulting (including, for this purpose, KPMG);

(ii) The Employee breaches Section 8.1(a)(i), 8.1(a)(ii), 8.1(b) or 8.2, in addition to the obligations imposed by Section 8.4(a)(i), the restrictions on transfer set forth in Article III hereof applicable to any and all Issued Equity that have not yet expired as of the

time of the Employee's breach of Section 8.1(a)(i), 8.1(a)(ii), 8.1(b) or 8.2, shall be automatically extended to and shall expire at the end of the ten (10) year period following the Effective Date.

(b) Any and all payments made pursuant to Section 8.4(a) shall be made ratably in quarterly installments over the twenty-four (24) month period following such breach. The Employee acknowledges, understands and agrees that Consulting will suffer damages as a result of the Employee's breach of Section 8.1(a)(i) or 8.1(a)(ii) that are difficult to calculate and that the payment required by this Section 8.4 is a reasonable forecast of the damages likely to result from such breach. In particular, the Employee acknowledges, understands and agrees that the Employee's Annual Compensation with Consulting and with KPMG is based on the Employee's value to Consulting, that the Annual Compensation reflects, among other things, the Employee's efforts at developing and maintaining client relationships and the Employee's success in participation in the management of Consulting's affairs and that the payment obligation set forth above reasonably approximates the value that Consulting will lose in the event that the Employee breaches Section 8.1(a)(i) or 8.1(a)(ii), and also reasonably compensates Consulting for the damages that it will suffer as a result of the Employee's breach of the duty of loyalty pursuant to Section 8.1.

(c) In the event of a breach of Section 8.1(b), the Employee shall, in addition to and without limiting any payments required under Section 8.4(a) or 8.4(d), pay to Consulting, Inc. an amount in cash equal to fifty percent (50%) of the gross fees and other amounts paid or payable during the three (3) year period following such breach to the Employee, or to any other individual, person, firm or other entity with which the Employee is or becomes directly or indirectly employed, retained or otherwise associated at the time of any breach, by any Client or Prospective Client that was solicited or provided with services in violation of Section 8.1(b). Payments to Consulting, Inc. pursuant to this Section 8.4(c) shall be due within thirty (30) days after any payment of fees or other amounts is made by the Client or Prospective Client. The Employee acknowledges, understands and agrees that Consulting will suffer damages as a result of the Employee's breach of Section 8.1(b) that are difficult to calculate, and that the payment required by this Section 8.4 (c) is a reasonable forecast of the damages likely to result from such breach.

(d) In the event of a breach of Section 8.2, the Employee shall, in addition to and without limiting any payments required under Section 8.4(a) or Section 8.4(c), pay to Consulting, Inc. an amount in cash equal to one hundred percent (100%) of the compensation (including, without limitation, base salary, any other base pay and incentive compensation) paid or payable by Consulting (which includes, for purposes of this calculation, any such compensation paid or payable by KPMG during the relevant twelve (12) month period described in this Section 8.4(d)) to the solicited, employed or retained employee or other agent during:

(i) The twelve (12) month period preceding the breaching Employee's breach of Section 8.2; or

(ii) In the case of a solicited, employed or retained employee or agent who neither was a current employee or agent of Consulting nor was associated with KPMG at the time of the Employee's breach, the twelve (12) month period preceding the later of the employee's or agent's (I) termination from employment with Consulting for any or no reason, or (II) separation from KPMG for any or no reason.

Payments to Consulting, Inc. pursuant to this Section 8.4(d) shall be made ratably in quarterly installments over the twenty-four (24) month period following such breach. The Employee acknowledges, understands and agrees that Consulting will suffer damages as a result of the Employee's breach of Section 8.2 that are difficult to calculate, and that the payment required by this Section 8.4(d) is a reasonable forecast of the damages likely to result from such breach.

(e) The Employee acknowledges, understands and agrees that the payment obligations and other provisions set forth in this Section 8.4 above are not, and are not intended to be, a penalty of any kind.

**Section 8.5. Proprietary Information.** (a) The Employee acknowledges, understands and agrees that the successful marketing, development and rendering of Consulting's professional services and products require substantial time and expense. Such efforts generate for Consulting valuable and proprietary information and materials that give Consulting a business advantage over others who do not have such information.

(b) The Employee will, both during the Employee's work for Consulting and thereafter, hold in confidence and not directly or indirectly reveal, report, publish, disclose or transfer any of the Proprietary Information to any person or entity, or utilize any of the Proprietary Information for any purpose, except in the course of the Employee's work for Consulting for Consulting's sole benefit. In addition, the Employee will not remove, reproduce, summarize or copy any Proprietary Information except as expressly required by Consulting to enable the Employee to perform the Employee's duties, and the Employee will return immediately to Consulting all Proprietary Information in the Employee's possession or control, including duplicates, when the Employee leaves his or her employment or whenever Consulting may otherwise require that such Proprietary Information be returned.

(c) The Employee will not knowingly use for the benefit of, or disclose to any person employed by, Consulting confidential information of any of the Employee's former employers or of any other third party or otherwise knowingly infringe any proprietary right of any third party. The Employee represents and warrants that no contract, agreement or other obligation between or among the Employee and any third party will interfere in any manner with the Employee's complete performance of the Employee's duties to Consulting or with the Employee's compliance with the terms and conditions hereof.

(d) The Employee understands that this Article VIII is effective as of the commencement of the Employee's employment with Consulting (or relationship with KPMG, as the case may be) or, if earlier, the date the Employee first acquired knowledge of any Proprietary Information.

**Section 8.6. Inventions.** (a) All Works shall belong exclusively to Consulting whether or not fixed in a tangible medium of expression. Without limiting the foregoing, to the maximum extent permitted under applicable law, all Works shall be deemed to be "works made for hire" under the United States Copyright Act, and Consulting shall be deemed to be the author thereof.

(b) If and to the extent any Works are determined not to constitute "works made for hire," or if any rights in the Works do not accrue to Consulting as a work made for hire, the Employee hereby irrevocably assigns and transfers to Consulting to the maximum extent permitted by law all right, title and interest in the Works, including all copyrights, patents, trade secret rights, and other proprietary rights in or relating to the Works. Without limiting the foregoing, the Employee hereby irrevocably assigns and transfers to Consulting all economic rights to the Works, including the rights to reproduce, manufacture, use, adapt, modify, publish, distribute, sublicense, publicly perform and communicate, translate, lease, import and otherwise exploit the Works.

(c) The Employee shall have no right to exercise any economic rights to the Works. Without limiting the foregoing, the Employee will not have the right to and will not reproduce, adapt, modify, publish, distribute, sublicense, publicly perform or communicate, translate, lease, import or otherwise exploit the Works, except as expressly authorized by Consulting.

(d) The Employee expressly acknowledges and agrees that the Employee wishes to remain anonymous and not to have the Employee's name or any pseudonym used in connection with the Works.

(e) The Employee hereby approves any and all modifications, uses, publications and other exploitation of the Works that Consulting or any successor or transferee thereof may elect to make, and the Employee expressly agrees that no such modifications, uses, publications or exploitations will or may cause harm to the Employee's honor or reputation. The Employee agrees that no modification, use or publication of the Works by Consulting or any successor or transferee thereof will be deemed to constitute a distortion or mutilation of the Works.

(f) Consulting shall have the unrestricted right to transfer and convey any or all of Consulting's rights in or relating to the Works to any person or entity.

(g) This Agreement shall be construed in accordance with the provisions of Section 2870 of the California Labor Code (the text of which is included in Schedule 8.6) relating to inventions made by an employee. Accordingly, this Agreement is not intended and shall not be interpreted to assign to or invest in Consulting any of the Employee's rights in any inventions developed entirely on the Employee's own time without using Consulting's equipment, supplies, facilities, or trade secret information, except for those inventions that either relate at the time of conception or reduction to practice of the inventions to the Consulting Business or the actual or

demonstrably anticipated research or development of Consulting, or result from any work the Employee performed for Consulting.

(h) Employee shall keep and maintain adequate and current written records of all inventions, original works of authorship, trade secrets or other Works in which rights vest in or are assigned to Consulting hereunder. The records will be in the form of notes, sketches, drawings, and any other format that may be specified by Consulting. The records will be available to and remain the sole property of Consulting at all times.

(i) Employee shall provide any assistance reasonably requested by Consulting to obtain United States or foreign letters patent and copyright registrations covering inventions, original works of authorship and other Works belonging or assigned hereunder to Consulting. Employee shall execute any transfers of ownership of letters patent or assignments of copyrights or other proprietary rights transferred or assigned hereunder (including short form assignments intended for recording with the U.S. Copyright Office, the U.S. Patent and Trademark Office, or any other entity). Employee's obligations under this Section shall survive any termination or expiration of this Agreement in perpetuity, provided that Consulting shall compensate Employee at a reasonable rate for time actually spent performing such obligations at Consulting's request after such termination or expiration. If Consulting is unable for any reason whatsoever, including Employee's mental or physical incapacity, to secure Employee's signature to apply for or to pursue any application for any United States or foreign letters patent or copyright registrations or on any document transferring or assigning any patent, copyright or other proprietary right that Employee is obligated hereunder to transfer or assign, Employee hereby irrevocably designates and appoints Consulting and its duly authorized officers and agents as Employee's agent and attorney in fact, to act for and on its behalf and in its stead to execute and file any such applications and documents and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent or copyright registrations or transfers or assignments thereof or of any other proprietary rights with the same legal force and effect as if executed by Employee. This appointment is coupled with an interest in and to the inventions, works of authorship, trade secrets and other Works to which any proprietary rights may apply and shall survive Employee's death or disability.

(j) Throughout this Section 8.6, the term Consulting shall mean (i) Consulting, Inc. for any period of time during which the Employee is employed by Consulting, Inc., (ii) LLC for any period of time during which the Employee is employed by LLC and (iii) any Subsidiary of Consulting, Inc. or LLC for any period of time during which the Employee is employed by such Subsidiary.

**Section 8.7. Termination.** (a) The Employee may voluntarily terminate the Employee's employment with Consulting upon one hundred eighty (180) days' prior written notice unless such notice shall be waived in writing by the Chief Executive Officer. In the event that the Employee breaches this Section 8.7(a) prior to the later of (i) the date which is eighteen (18) months after the Effective Date or (ii) the date which is twelve (12) months after the consummation of an IPO, the Employee shall pay Consulting, Inc. (it being understood and agreed that the Employee shall deliver any amounts payable pursuant to this Section 8.7(a) to

Consulting, Inc. and not to any of its Subsidiaries, and it being further understood that Consulting, Inc. shall take responsibility for apportioning any amounts paid hereunder among itself, LLC and their respective Subsidiaries as may be appropriate under the circumstances) an amount in cash equal to fifty percent (50%) of the average Annual Compensation paid or payable on an annualized basis to the Employee by Consulting over the course of the completed fiscal year of Consulting immediately preceding the Consulting fiscal year in which the Employee's breach occurs. Solely for the purpose of this Section 8.7(a), any period of time during which the Employee was associated with KPMG, and any amounts paid or to be paid by KPMG (whether as base compensation, incentive compensation or other compensation) during such period, shall be deemed to be included in determining the fiscal years during which the Employee was employed by Consulting and the amount of the Annual Compensation paid or payable by Consulting to the Employee for such fiscal years. The amount payable hereunder shall be in addition to and without in any way limiting any remedies at law or in equity that may be available to Consulting for any breach of this Agreement (including, without limitation, any remedies under Section 9.1(e) or 10.11 of this Agreement), and without in any way precluding or being construed to preclude Consulting from making a showing of irreparable injury or any other element that may be necessary to secure injunctive relief. Any and all payments made pursuant to this Section 8.7(a) shall be made ratably in quarterly installments over the twenty-four (24) month period following such breach.

(b) The Employee agrees to provide all assistance requested by Consulting, whether before, upon, or after the termination of the Employee's employment with Consulting for any or no reason (including voluntary resignation by the Employee or termination at the request of Consulting), in transitioning the Employee's duties, responsibilities and client and other Consulting relationships to other Consulting personnel in connection with any such termination of the Employee's employment with Consulting.

**Section 8.8. Waiver.** (a) The Chief Executive Officer may, in his or her sole discretion, waive any of the provisions of Sections 8.1 through 8.7.

(b) Notwithstanding Section 8.8(a), and except as provided in Section 6.2(c), no provision herein shall or shall be construed to restrict, limit or otherwise affect any rights that Consulting or KPMG or their Affiliates may have or any obligations that the Employee may have under any provision of the KPMG Partnership Agreement, the By-Laws of KPMG or otherwise, it being understood and agreed that the provisions of the KPMG Partnership Agreement and the By-Laws of KPMG (as in effect or amended from time to time) shall continue in full force and effect in accordance with their terms.

**Section 8.9. No Employment Agreement.** The Employee understands that this Agreement is not intended to and shall not be construed to constitute an express or implicit employment contract for any purpose, including for a specific duration of time. The Employee acknowledges and understands that, unless Consulting and the Employee otherwise clearly and expressly agree in writing, the Employee is employed at will, which means that either the Employee or Consulting may terminate the employment relationship at any time, for any reason or

for no reason, with or without notice, except for such notice as required of the Employee pursuant to Section 8.7.

180 days notice (6 mo)

## ARTICLE IX
## ARBITRATION

**Section 9.1. Arbitration.** (a) To the extent permitted by law, all claims or disputes arising out of or relating to the construction, meaning or effect of any provision of this Agreement, to the Employee's employment relationship with Consulting (which term shall include for purposes of this entire Article IX, the Subsidiaries of Consulting), or to the termination of this Agreement or cessation of such employment relationship:

(i) that the Employee may have against or with Consulting, any of its Affiliates, partnerships, other related entities, successors, or permitted assigns, or any director, officer, trustee, fiduciary, administrator, employee, owner, shareholder, partner, principal, attorney, member, agent, or representative of any of the foregoing entities; or

(ii) that Consulting may have against or with the Employee

(collectively, "Disputes"), shall be submitted for resolution by arbitration in accordance with the procedures set forth in this Section 9.1. Disputes subject to arbitration hereunder include, but are not limited to, claims by the Employee for employment discrimination, harassment, retaliation, wrongful termination, or other violations under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans With Disabilities Act, the Family and Medical Leave Act, or the Employee Retirement Income Security Act, under any other federal, state, or local law, regulation, ordinance, executive order, or constitution, or under common law. All arbitrations hereunder shall be held in the State of Virginia or the State of New York at the election of Consulting.

(b) Arbitrations shall take place before a panel of three arbitrators (the "Arbitration Panel"), which shall consist of one person selected by each of the two sides to the Dispute and the third person to be jointly selected by the two arbitrators previously selected.

(c) The Arbitration Panel shall have no authority to amend or modify the terms of this Agreement (except pursuant to Section 10.5) or to award punitive or exemplary damages.

(d) Judgment on any award rendered pursuant to this Section 9.1 may be entered in the courts of the State of Virginia or the State of New York, at the election of Consulting or in any other court having jurisdiction, or application may be made to such court for a judicial recognition of the award or an order of enforcement thereof, as the case may be.

(e) Notwithstanding anything in this Section 9.1 to the contrary, Consulting may seek provisional relief, including, but not limited to, temporary restraining orders and preliminary

injunctions, from a court of competent jurisdiction in aid of the arbitration, to prevent any award from being rendered ineffectual, to protect Consulting's Proprietary Information or Works or for any other purpose in the interests of Consulting. Seeking any such relief shall not be deemed a waiver of Consulting's right to compel arbitration. The courts of the State of Virginia or the State of New York, at the election of Consulting, as well as any other court of competent jurisdiction, shall have jurisdiction over any proceeding relating to arbitrations under this Section 9.1.

**Section 9.2. Reimbursement.** The Employee agrees to reimburse Consulting upon demand for any and all costs, expenses and other amounts (including, without limitation, attorneys' fees and court costs) incurred by Consulting in enforcing any of its rights under this Agreement (except to the extent inconsistent with the enforcement of Section 9.1).

## ARTICLE X

## MISCELLANEOUS

**Section 10.1. Survival.** The provisions of this Agreement shall remain in full force and effect in accordance with their terms notwithstanding any termination of the Employee's employment with Consulting or any of its Subsidiaries for any or no reason or any dissolution or liquidation of LLC.

**Section 10.2. Entire Agreement.** This Agreement and the Schedules and Exhibits hereto constitute the only agreements between the Parties with respect to the subject matter hereof, there being no prior written or oral promises or representations not incorporated herein or therein.

**Section 10.3. Choice of Law.** This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York and the federal laws of the United States of America applicable therein, as though all acts and omissions related hereto occurred in New York. Any lawsuit arising from or related to this Agreement may be brought, to the extent any such lawsuit is permitted pursuant to Article IX, in any state court in the State of Virginia or in the State of New York, at the election of Consulting, and in the United States District Courts located in the State of Virginia or the Borough of Manhattan, New York, New York, at the election of Consulting. To the extent permissible by law, the Parties hereby consent to the jurisdiction and venue of such courts. Notwithstanding anything to the contrary in the foregoing, nothing in this Section 10.3 shall prevent any Party or any of such Party's Affiliates from bringing a lawsuit, to the extent any such lawsuit is permitted pursuant to Article IX, in any other federal or state court of full and competent jurisdiction. Each Party hereby waives, releases and agrees not to assert, and agrees to cause its Affiliates to waive, release and not assert, any rights such Party or its Affiliates may have under any foreign law or regulation that would be inconsistent with the terms of this Agreement as governed by New York law.

**Section 10.4. Amendment; Waiver.** No amendment or modification of the terms of this Agreement shall be binding on any Party unless reduced to writing and signed by an authorized representative of the Party to be bound. The waiver by any Party of any particular default by any other Party shall not affect or impair the rights of the Party so waiving with respect to any subsequent default of the same or a different kind; nor shall any delay or omission by any Party to exercise any right arising from any default by any other Party affect or impair any rights which the nondefaulting Party may have with respect to the same or any future default.

**Section 10.5. Severability.** If any provision of this Agreement including, without limitation, any provision of Article VIII, is held invalid or unenforceable for any reason, the invalidity shall not affect the validity of the remaining provisions of this Agreement, and the parties shall substitute for the invalid provision a valid provision which most closely approximates the intent and economic effect of the invalid provision. Without limiting the generality of the foregoing, if any provision of this Agreement shall be determined, under applicable law, to be overly broad in duration, geographical coverage or substantive scope, or otherwise unreasonable or unenforceable such provision shall be deemed narrowed to the broadest term permitted by applicable law and shall be enforced as so narrowed.

**Section 10.6. Counterparts; Signatures.** (a) For convenience of the parties, this Agreement may be executed in one or more counterparts, each of which shall be deemed an original for all purposes.

(b) Each Party hereto acknowledges that it and each other Party hereto may execute this Agreement, and any other agreement, certificate or document contemplated herein or therein or related hereto by facsimile, stamp or mechanical signature. Each Party hereto expressly adopts and confirms each such facsimile, stamp or mechanical signature made in its respective name as if it were a manual signature, agrees that it will not assert that any such signature is not adequate to bind such Party to the same extent as if it were signed manually and agrees that at the reasonable request of any other Party hereto at any time it will as promptly as reasonably practicable cause this Agreement, and any other agreement, certificate or document contemplated herein or therein or related hereto to be manually executed (any such execution to be as of the date of the initial date thereof).

**Section 10.7. Beneficiaries.** This Agreement is solely for the benefit of the Parties and their respective Affiliates, successors and permitted assigns and shall not confer upon any other Person any remedy, claim, liability, reimbursement or other right in addition to those existing without reference to this Agreement.

**Section 10.8. Notices.** All notices which any Party may be required or desire to give to another Party shall be in writing and shall be given by personal service, telecopy, registered mail or certified mail (or its equivalent), or overnight courier to the other parties at their respective address or telecopy telephone number set forth below. Mailed notices and notices by overnight courier shall be deemed to be given upon actual receipt by the Party to be notified. Notices delivered by telecopy shall also be confirmed in writing by the sending Party by overnight

courier and shall be deemed to be given upon actual receipt of the overnight courier package by the Parties to be notified.

If to Consulting, Inc.:

KPMG Consulting, Inc.
Three Chestnut Ridge Road
Montvale, New Jersey 07645
Attention: Chief Financial Officer
Facsimile: (201) 307-7227

If to LLC:

KPMG Consulting, LLC
Three Chestnut Ridge Road
Montvale, New Jersey 07645
Attention: Chief Financial Officer
Facsimile: (201) 307-7227

If to KPMG:

KPMG LLP
Three Chestnut Ridge Road
Montvale, New Jersey 07645
Attention: Chief Financial Officer
Facsimile: (201) 307-7227

If to the Employee, to the address listed on the records of Consulting. A Party may change its address or addresses set forth above by giving the other parties notice of such change in accordance with the provisions of this Section 10.8.

**Section 10.9.** **Schedules and Exhibits.** All Schedules and Exhibits referred to herein are intended to be and hereby are specifically made a part of this Agreement.

**Section 10.10.** **Assignability.** This Agreement shall be binding upon and inure to the benefit of the Parties hereto, respectively, and their respective Affiliates, successors and permitted assigns; provided, however, that the Employee may not assign its rights or delegate its obligations under this Agreement without the express prior written consent of the other parties hereto. Without limiting the foregoing, the rights of LLC hereunder may be assigned in whole or in part to Consulting, Inc. or KPMG or their respective Subsidiaries, the rights of Consulting, Inc. hereunder may be assigned in whole or in part to LLC or KPMG or their respective Subsidiaries and the rights of KPMG hereunder may be assigned in whole or in part to LLC, Consulting, Inc. or their respective Subsidiaries, each without the consent of the Employee.

**Section 10.11.** **Specific Performance.** In the event of any actual or threatened default in, or breach of, any of the terms, conditions and provisions of this Agreement, the Party or Parties or their respective Affiliates who are or are to be thereby aggrieved shall have the right to specific performance and injunctive or other equitable relief of its rights under this Agreement, in addition to any and all other rights and remedies at law or in equity, and all such rights and remedies shall be cumulative. The Parties agree that the remedies at law for any breach or threatened breach, including, without limitation, monetary damages, are inadequate compensation for any loss and that any defense in any action for specific performance that a remedy at law would be adequate is waived. Any requirements for the securing or posting of any bond with such remedy are waived.

**Section 10.12.** **Legal Counsel.** The Employee acknowledges, represents and warrants to Consulting that the Employee has received a copy of this Agreement, that the Employee has read and understood this Agreement, that the Employee has had the opportunity to seek the advice of legal counsel before signing this Agreement and that the Employee has either sought such counsel or has voluntarily decided not to do so.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of and deemed effective as of the Effective Date.

KPMG CONSULTING, LLC

By: ______________________________
Name:
Title:

KPMG CONSULTING, INC.

By: ______________________________
Name:
Title:

KPMG LLP

By: ______________________________
Name:
Its:

[Employee Name]

______________________________

Signature Page
to the
Member Distribution Agreement

X01006?

EXHIBIT E

X010078

# EXHIBIT "E"

CM-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Stephen B. Morris 126192
Morris and Associates
401 West A St., Ste 2200
San Diego, CA 92101
TELEPHONE NO.: (619) 239-1300 FAX NO.: (619) 234-3672
ATTORNEY FOR (Name): George Murphy

FOR COURT USE ONLY

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Diego
STREET ADDRESS: 330 W. Broadway
MAILING ADDRESS:
CITY AND ZIP CODE: San Diego, CA 92101
BRANCH NAME: Hall of Justice

COPY

CASE NAME: Murphy v. Bearingpoint, Inc.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: GIC 870905 |
|---|---|---|
| [X] Unlimited (Amount demanded exceeds $25,000) [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter [ ] Joinder<br>Filed with first appearance by defendant (Cal. Rules of Court, rule 1811) | JUDGE:<br>DEPT.: |

*Items 1-5 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [X] Breach of contract/warranty (06)
- [ ] Collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 1800-1812)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition *(not specified above)* (43)

2. This case [ ] is [X] is not complex under rule 1800 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision
3. Type of remedies sought *(check all that apply)*:
   a. [X] monetary b. [ ] nonmonetary; declaratory or injunctive relief c. [ ] punitive
4. Number of causes of action *(specify)*: One (1)
5. This case [ ] is [X] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: August 14, 2006

Stephen B. Morris
(TYPE OR PRINT NAME)

▶ Stephen Morris
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 201.8.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 1800 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this a complex case, this cover sheet will be used for statistical purposes only.

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers**

If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 5 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. You do not need to submit a cover sheet with amended papers. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 201.8(c) and 227 of the California Rules of Court.

**To Parties in Complex Cases**

In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 1800 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
- Auto (22)-Personal Injury/Property Damage/Wrongful Death
- Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
- Asbestos (04)
  - Asbestos Property Damage
  - Asbestos Personal Injury/ Wrongful Death
- Product Liability *(not asbestos or toxic/environmental)* (24)
- Medical Malpractice (45)
  - Medical Malpractice-Physicians & Surgeons
  - Other Professional Health Care Malpractice
- Other PI/PD/WD (23)
  - Premises Liability (e.g., slip and fall)
  - Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  - Intentional Infliction of Emotional Distress
  - Negligent Infliction of Emotional Distress
  - Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
- Business Tort/Unfair Business Practice (07)
- Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
- Defamation (e.g., slander, libel) (13)
- Fraud (16)
- Intellectual Property (19)
- Professional Negligence (25)
  - Legal Malpractice
  - Other Professional Malpractice *(not medical or legal)*
- Other Non-PI/PD/WD Tort (35)

**Employment**
- Wrongful Termination (36)
- Other Employment (15)

**Contract**
- Breach of Contract/Warranty (06)
  - Breach of Rental/Lease
    - Contract *(not unlawful detainer or wrongful eviction)*
  - Contract/Warranty Breach-Seller Plaintiff *(not fraud or negligence)*
  - Negligent Breach of Contract/ Warranty
  - Other Breach of Contract/Warranty
- Collections (e.g., money owed, open book accounts) (09)
  - Collection Case-Seller Plaintiff
  - Other Promissory Note/Collections Case
- Insurance Coverage *(not provisionally complex)* (18)
  - Auto Subrogation
  - Other Coverage
- Other Contract (37)
  - Contractual Fraud
  - Other Contract Dispute

**Real Property**
- Eminent Domain/Inverse Condemnation (14)
- Wrongful Eviction (33)
- Other Real Property (e.g., quiet title) (26)
  - Writ of Possession of Real Property
  - Mortgage Foreclosure
  - Quiet Title
  - Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
- Commercial (31)
- Residential (32)
- Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
- Asset Forfeiture (05)
- Petition Re: Arbitration Award (11)
- Writ of Mandate (02)
  - Writ-Administrative Mandamus
  - Writ-Mandamus on Limited Court Case Matter
  - Writ-Other Limited Court Case Review
- Other Judicial Review (39)
  - Review of Health Officer Order
  - Notice of Appeal-Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 1800-1812)**
- Antitrust/Trade Regulation (03)
- Construction Defect (10)
- Claims Involving Mass Tort (40)
- Securities Litigation (28)
- Environmental/Toxic Tort (30)
- Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
- Enforcement of Judgment (20)
  - Abstract of Judgment (Out of County)
  - Confession of Judgment *(non-domestic relations)*
  - Sister State Judgment
  - Administrative Agency Award *(not unpaid taxes)*
  - Petition/Certification of Entry of Judgment on Unpaid Taxes
  - Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
- RICO (27)
- Other Complaint *(not specified above)* (42)
  - Declaratory Relief Only
  - Injunctive Relief Only *(non-harassment)*
  - Mechanics Lien
  - Other Commercial Complaint Case *(non-tort/non-complex)*
  - Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
- Partnership and Corporate Governance (21)
- Other Petition *(not specified above)* (43)
  - Civil Harassment
  - Workplace Violence
  - Elder/Dependent Adult Abuse
  - Election Contest
  - Petition for Name Change
  - Petition for Relief from Late Claim
  - Other Civil Petition



Murphy

EXHIBIT F

X0010075

EXHIBIT "F"

X01G075

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

INDEPENDENT CALENDAR CLERK
330 W. Broadway
San Diego, CA 92101

TO:

STEPHEN B. MORRIS
MORRIS & ASSOCIATES
401 WEST "A" ST STE 2200
SAN DIEGO, CA 92101

| | |
|---|---|
| GEORGE MURPHY<br>Plaintiff(s)<br>vs.<br>BEARINGPOINT INC<br>Defendant(s) | Case No.: GIC870905<br>**NOTICE OF CASE ASSIGNMENT**<br>Judge: KEVIN A. ENRIGHT<br>Department: 72<br>Phone: 619-685-6027 |

**COMPLAINT FILED** 08/15/06

IT IS THE DUTY OF EACH PLAINTIFF (AND CROSS-COMPLAINANT) TO SERVE A COPY OF THIS NOTICE WITH THE COMPLAINT (AND CROSS-COMPLAINT).

ALL COUNSEL WILL BE EXPECTED TO BE FAMILIAR WITH SUPERIOR COURT RULES WHICH HAVE BEEN PUBLISHED AS DIVISION II, AND WILL BE STRICTLY ENFORCED.

**TIME STANDARDS:** The following timeframes apply to general civil cases and must be adhered to unless you have requested and been granted an extension of time. General civil consists of all cases except: Small claims appeals, petitions, and unlawful detainers.

**COMPLAINTS:** Complaints must be served on all named defendants, and a CERTIFICATE OF SERVICE (SDSC CIV-345) filed within 60 days of filing. This is a mandatory document and may not be substituted by the filing of any other document. (Rule 2.5)

**DEFENDANT'S APPEARANCE:** Defendant must generally appear within 30 days of service of the complaint. (Plaintiff may stipulate to no more than a 15 day extension which must be in writing and filed with the Court.) (Rule 2.6)

**DEFAULT:** If the defendant has not generally appeared and no extension has been granted, the plaintiff must request default within 45 days of the filing of the Certificate of Service. (Rule 2.7)

THE COURT ENCOURAGES YOU TO CONSIDER UTILIZING VARIOUS ALTERNATIVES TO LITIGATION, INCLUDING MEDIATION AND ARBITRATION, PRIOR TO THE CASE MANAGEMENT CONFERENCE. MEDIATION SERVICES ARE AVAILABLE UNDER THE DISPUTE RESOLUTION PROGRAMS ACT AND OTHER PROVIDERS. SEE ADR INFORMATION PACKET AND STIPULATION.

YOU MAY ALSO BE ORDERED TO PARTICIPATE IN ARBITRATION PURSUANT TO CCP 1141.10 AT THE CASE MANAGEMENT CONFERENCE. THE FEE FOR THESE SERVICES WILL BE PAID BY THE COURT IF ALL PARTIES HAVE APPEARED IN THE CASE AND THE COURT ORDERS THE CASE TO ARBITRATION PURSUANT TO CCP 1141.10. THE CASE MANAGEMENT CONFERENCE WILL BE CANCELLED IF YOU FILE FORM SDSC CIV-359 PRIOR TO THAT HEARING.

ALSO SEE THE ATTACHED NOTICE TO LITIGANTS.

**CERTIFICATE OF SERVICE**

I certify that I am not a party to the above-entitled case; on the date shown below, I served this notice on the parties shown by personally handing it to the attorney or their personal representative at SAN DIEGO California.

DATED: 08/15/06

BY: CLERK OF THE SUPERIOR COURT

2010077

X010079

**EXHIBIT "G"**

JODY A. LANDRY, Bar No. 125743
LARA K. STRAUSS, Bar No. 222866
LITTLER MENDELSON
A Professional Corporation
501 W. Broadway, Suite 900
San Diego, CA 92101.3577
Telephone: 619.232.0441
Facsimile: 619.232.4302

FILED
CIVIL BUSINESS OFFICE 19
CENTRAL DIVISION
06 SEP 11 AM 10: 43
CLERK-SUPERIOR COURT
SAN DIEGO COUNTY, CA

Attorneys for Defendant
BEARINGPOINT, INC.

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN DIEGO

| | |
|---|---|
| GEORGE MURPHY,<br>Plaintiff,<br>v.<br>BEARINGPOINT, INC.,<br>Defendant. | Case No. GIC 870905<br>Assigned for all purposes to the Honorable Kevin A. Enright, Dept. 72<br>**DEFENDANT BEARINGPOINT, INC.'S ANSWER TO PLAINTIFF'S COMPLAINT FOR DAMAGES**<br>Complaint Filed: August 15, 2006<br>Trial Date: None Set |

Defendant BEARINGPOINT, INC. ("Defendant" or "BearingPoint") hereby answers the unverified complaint for damages ("Complaint") filed by Plaintiff George Murphy ("Plaintiff") as follows:

## I.
## GENERAL DENIAL

Pursuant to the provisions of California Code of Civil Procedure section 431.30(d), Defendant denies generally and specifically each and every allegation contained in the Complaint. In addition, Defendant denies that Plaintiff has sustained, or will sustain, any loss or damage in the manner alleged, or otherwise, by reason of any act or omission, or any other conduct or absence thereof, on the part of Defendant or anyone acting on its behalf. Without conceding that it has the burden of proof or persuasion, Defendant also asserts the following affirmative defenses.

///

Firmwide:81461121.1 052466.1000

## II.
## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

As a separate and distinct affirmative defense, Defendant alleges that the Complaint and each and every alleged cause of action therein fails to state facts sufficient to constitute a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

As a separate and distinct affirmative defense, Defendant alleges that the Complaint is barred by the doctrines of waiver, unclean hands, estoppel and/or laches.

### THIRD AFFIRMATIVE DEFENSE

As a separate and distinct affirmative defense, Defendant allege that the Complaint is barred by the statutes of limitations set forth in California Code of Civil procedure sections 337(1) and 339(1) and any other applicable statute of limitations.

### FOURTH AFFIRMATIVE DEFENSE

As a separate and distinct affirmative defense, Defendant alleges that no duty or obligation, contractual or otherwise, was or is owed to Plaintiff by Defendant as alleged in the Complaint.

### FIFTH AFFIRMATIVE DEFENSE

As a separate and distinct affirmative defense, Defendant alleges that any obligation or duty, contractual or otherwise, which Plaintiff claims is owed to him, was extinguished because Plaintiff failed to satisfy his duties to Defendant.

### SIXTH AFFIRMATIVE DEFENSE

As a separate and distinct affirmative defense, Defendant alleges that any agreement between it and Plaintiff, if any, was rescinded by mutual consent.

### SEVENTH AFFIRMATIVE DEFENSE

As a separate and distinct affirmative defense, Defendant alleges that any agreement between it and Plaintiff, if any, was modified by mutual consent.

///

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
501 W Broadway
Suite 900
San Diego, CA 92101 3577
619.232.0441

EIGHTH AFFIRMATIVE DEFENSE

As a separate and distinct affirmative defense, Defendant alleges that the Complaint is barred by the provisions of Civil Code section 1624 in that the agreement between Plaintiff and Defendant, if an existed, is an agreement that by its terms was not to be performed within a year and no note or memorandum of it is in writing signed by Defendant.

NINTH AFFIRMATIVE DEFENSE

As a separate and distinct affirmative defense, Defendant alleges that Plaintiff's Complaint is barred because his agreement with Defendant, if any existed, and Plaintiff's claims related to the agreement are subject to final, binding, and exclusive arbitration procedure binding on Plaintiff, and, therefore, this Court is not the proper forum for the resolution of the claims alleged in the Complaint.

TENTH AFFIRMATIVE DEFENSE

As a separate and distinct affirmative defense, Defendant alternatively alleges that Plaintiff is barred from seeking any recovery under or arising out of an agreement with Defendant, if any existed, that provides for binding arbitration because Plaintiff has breached that contract by repudiating the arbitration remedy provided therein and failing to exhaust contractual remedies.

ELEVENTH AFFIRMATIVE DEFENSE

As a separate and distinct affirmative defense, Defendant alleges that Plaintiff has failed, refused and/or neglected to mitigate or avoid the damages complained of in the Complaint, if any.

TWELFTH AFFIRMATIVE DEFENSE

As a separate and distinct affirmative defense, Defendant alleges that if any damages or injuries were in fact suffered by Plaintiff, such damages or injuries must be reduced or diminished by amounts received or receivable by Plaintiff in the exercise of reasonable diligence as income or in lieu of earned income.

THIRTEENTH AFFIRMATIVE DEFENSE

Defendant currently has insufficient information upon which to form a belief as to whether it has additional, as yet unstated, affirmative defenses available. Defendant therefore

reserves the right to assert additional affirmative defenses in the event that discovery indicates they would be appropriate.

WHEREFORE, Defendant prays that:

1. The Complaint be dismissed in its entirety with prejudice and Plaintiff take nothing by his Complaint;

2. Judgment be entered against Plaintiff and in favor of Defendant;

3. Defendant be awarded its costs of suit and reasonable attorneys' fees incurred herein; and

4. The Court award Defendant such other and further relief as it deems appropriate.

Dated: September 11, 2006

JODY A. LANDRY
LARA K. STRAUSS
LITTLER MENDELSON
A Professional Corporation
Attorneys for Defendant
BEARINGPOINT, INC.

Murphy v. Bearingpoint Inc.
San Diego Superior Court Case No. GIC 870905

FILED
CIVIL BUSINESS OFFICE 19
CENTRAL DIVISION
06 SEP 11 AM 10: 43
CLERK-SUPERIOR COURT
SAN DIEGO COUNTY, CA

**PROOF OF SERVICE**

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is 501 W. Broadway, Suite 900, San Diego, California 92101.3577. On September 11, 2006, I served the within document(s):

**DEFENDANT BEARINGPOINT, INC.'S ANSWER TO PLAINTIFF'S COMPLAINT FOR DAMAGES**

☐ by facsimile transmission at or about _______ on that date. This document was transmitted by using a facsimile machine that complies with California Rules of Court Rule 2003(3), telephone number 619.232.4302. The transmission was reported as complete and without error. A copy of the transmission report, properly issued by the transmitting machine, is attached. The names and facsimile numbers of the person(s) served are as set forth below.

☒ by placing a true copy of the document(s) listed above for collection and mailing following the firm's ordinary business practice in a sealed envelope with postage thereon fully prepaid for deposit in the United States mail at San Diego, California addressed as set forth below.

☐ by depositing a true copy of the same enclosed in a sealed envelope, with delivery fees provided for, in an overnight delivery service pick up box or office designated for overnight delivery, and addressed as set forth below.

☐ by personally delivering a copy of the document(s) listed above to the person(s) at the address(es) set forth below.

| | |
|---|---|
| Stephen B. Morris, Esq.<br>Morris and Associates<br>401 West "A" Street, Suite 2200<br>San Diego, CA 92101<br>Telephone: (619) 239-1300 | Attorney for Plaintiff,<br>GEORGE MURPHY |

I am readily familiar with the firm's practice of collection and processing correspondence for mailing and for shipping via overnight delivery service. Under that practice it would be deposited with the U.S. Postal Service or if an overnight delivery service shipment, deposited in an overnight delivery service pick-up box or office on the same day with postage or fees thereon fully prepaid in the ordinary course of business.

Murphy v. Bearingpoint Inc.
San Diego Superior Court Case No. GIC 870905

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on September 11, 2006, at San Diego, California.

Kimberly Dammeyer

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
501 W Broadway
Suite 900
San Diego, CA 92101 3577
619 232 0441

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**
GEORGE MURPHY

**DEFENDANTS**
BEARINGPOINT, INC.

'06CV 1842 B JMA

FILED 2006 SEP 12 PM 4:00
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY ___ DEPUTY

(b) County of Residence of First Listed Plaintiff San Diego County, CA
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Fairfax County, VA
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Stephen B. Morris, Esq.
Morris and Associates
401 West "A" Street, Suite 2200
San Diego, CA 92101
(619) 239-1300

Attorneys (If Known)
Jody A. Landry, Esq., Bar No. 125743
Lara K. Strauss, Esq., Bar No. 222866
Littler Mendelson, P.C.
501 W. Broadway, Suite 900
San Diego, CA 92101
(619) 232-0441

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

**CONTRACT**
☐ 110 Insurance ☐ 120 Marine ☐ 130 Miller Act ☐ 140 Negotiable Instrument ☐ 150 Recovery of Overpayment & Enforcement of Judgment ☐ 151 Medicare Act ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) ☐ 153 Recovery of Overpayment of Veteran's Benefits ☐ 160 Stockholders' Suits ☒ 190 Other Contract ☐ 195 Contract Product Liability ☐ 196 Franchise

**REAL PROPERTY**
☐ 210 Land Condemnation ☐ 220 Foreclosure ☐ 230 Rent Lease & Ejectment ☐ 240 Torts to Land ☐ 245 Tort Product Liability ☐ 290 All Other Real Property

**TORTS**
PERSONAL INJURY: ☐ 310 Airplane ☐ 315 Airplane Product Liability ☐ 320 Assault, Libel & Slander ☐ 330 Federal Employers' Liability ☐ 340 Marine ☐ 345 Marine Product Liability ☐ 350 Motor Vehicle ☐ 355 Motor Vehicle Product Liability ☐ 360 Other Personal Injury
PERSONAL INJURY: ☐ 362 Personal Injury—Med. Malpractice ☐ 365 Personal Injury — Product Liability ☐ 368 Asbestos Personal Injury Product Liability
PERSONAL PROPERTY: ☐ 370 Other Fraud ☐ 371 Truth in Lending ☐ 380 Other Personal Property Damage ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
☐ 441 Voting ☐ 442 Employment ☐ 443 Housing/ Accommodations ☐ 444 Welfare ☐ 445 Amer. w/Disabilities - Employment ☐ 446 Amer. w/Disabilities - Other ☐ 440 Other Civil Rights

**PRISONER PETITIONS**
☐ 510 Motions to Vacate Sentence
Habeas Corpus: ☐ 530 General ☐ 535 Death Penalty ☐ 540 Mandamus & Other ☐ 550 Civil Rights ☐ 555 Prison Condition

**FORFEITURE/PENALTY**
☐ 610 Agriculture ☐ 620 Other Food & Drug ☐ 625 Drug Related Seizure of Property 21 USC 881 ☐ 630 Liquor Laws ☐ 640 R.R. & Truck ☐ 650 Airline Regs. ☐ 660 Occupational Safety/Health ☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act ☐ 720 Labor/Mgmt. Relations ☐ 730 Labor/Mgmt.Reporting & Disclosure Act ☐ 740 Railway Labor Act ☐ 790 Other Labor Litigation ☐ 791 Empl. Ret. Inc. Security Act

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158 ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
☐ 820 Copyrights ☐ 830 Patent ☐ 840 Trademark

**SOCIAL SECURITY**
☐ 861 HIA (1395ff) ☐ 862 Black Lung (923) ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant) ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
☐ 400 State Reapportionment ☐ 410 Antitrust ☐ 430 Banks and Banking ☐ 450 Commerce ☐ 460 Deportation ☐ 470 Racketeer Influenced and Corrupt Organizations ☐ 480 Consumer Credit ☐ 490 Cable/Sat TV ☐ 810 Selective Service ☐ 850 Securities/Commodities/ Exchange ☐ 875 Customer Challenge 12 USC 3410 ☐ 890 Other Statutory Actions ☐ 891 Agricultural Acts ☐ 892 Economic Stabilization Act ☐ 893 Environmental Matters ☐ 894 Energy Allocation Act ☐ 895 Freedom of Information Act ☐ 900 Appeal of Fee Determination Under Equal Access to Justice ☐ 950 Constitutionality of State Statutes

**V. ORIGIN** (Place an "X" in One Box Only)
☐ 1 Original Proceeding ☒ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ 6 Multidistrict Litigation ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (**Do not cite jurisdictional statutes unless diversity**):
28 U.S.C. Section 1332 -- Diversity Jurisdiction
Brief description of cause:

**VII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 **DEMAND** $162,500.00
CHECK YES only if demanded in complaint: **JURY DEMAND:** ☐ Yes ☒ No

**VIII. RELATED CASE(S) IF ANY** (See instructions): JUDGE ___ DOCKET NUMBER ___

DATE September 12, 2006 SIGNATURE OF ATTORNEY OF RECORD Lara K. S

**FOR OFFICE USE ONLY**
RECEIPT # 129172 AMOUNT $350 APPLYING IFP ___ JUDGE ___ MAG. JUDGE ___
Ser 9/12/06

JS 44 Reverse (Rev. 11/04)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.** **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b.) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS-44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.** **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a) Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553
Brief Description: Unauthorized reception of cable service

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS-44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

American LegalNet, Inc. www.USCourtForms.com

UNITED STATES
DISTRICT COURT
Southern District of California
San Diego Division

# 129172 - A1
September 12, 2006

| Code | Case # | Qty | Amount |
|---|---|---|---|
| CV086900 | 3-06-CV-1842 | | 60.00 CH |
| Judge | - BREWSTER | | |
| CV086400 | | | 100.00 CH |
| CV510000 | | | 190.00 CH |

Total-> 350.00

FROM: CIVIL FILING
MURPHY V. BEARINGPOINT INC.
BC# 213905
SH